**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PURITY FOOD STORES, INC. (SAV-MORE FOOD STORES),**
**Respondent.**

**No. 6582.**

United States Court of Appeals
First Circuit.

Heard Nov. 1, 1965.
Decided Dec. 30, 1965.

Glen M. Bendixsen, Washington, D. C., Attorney, with whom Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Allen M. Hutter, Attorney, were on brief, for petitioner.

Allan A. Tepper, Boston, Mass., with whom Snyder, Tepper, Berlin & Katz, Boston, Mass., was on brief, for respondent.

Before ALDRICH, Chief Judge, and HASTIE * and McENTEE, Circuit Judges.

ALDRICH, Chief Judge.

In this petition to enforce an order of the National Labor Relations Board based upon alleged violations of sections 8(a) (1) and 8(a) (5) of the National Labor Relations Act, 29 U.S.C. § 158(a) (5) and (1), respondent answered, praying that the order be set aside. The findings as to subsection (1), of improper interference with organization by surveillance and overly hostile talk, are clearly correct and need not be considered. The sole questions are whether the union had enrolled a majority of the unit, and whether the unit was in fact appropriate. Because for no good reason, indeed, for no given reason, the employer refused the offer of an independent card check, under familiar principles it cannot assert a good faith doubt as to the number claimed. N. L. R. B. v. George Groh & Sons, 10 Cir., 1964, 329 F.2d 265, 269. By its clearly established (8) (a) (1) violations it is barred from asserting a good faith, although erroneous, doubt as to the appropriateness of the unit. N. L. R. B. v. Primrose Super Market of Salem, Inc., 1 Cir., 1965, 353 F.2d 675.

* By designation.

■ The facts as to representation are these. On May 13 and 14, 1964, as a result of what the trial examiner termed a "quickie" organizational campaign, the union [1] obtained 66 cards from the 107 full and regular part-time employees of the respondent Purity Food Stores' Peabody, Massachusetts store. The Board reduced this number to 65.[2] If this figure should be further reduced by the number of cards obtained by one Silva, the union would not have a majority.

■■ Silva was found by the trial examiner to be a supervisor, making cards obtained by him void. N. L. R. B. v. Hamilton Plastic Molding Co., 6 Cir., 1963, 312 F.2d 723. The Board reversed this factual finding. It is admitted that Silva did not have power to hire and fire, and that he was, fundamentally, an "aisle boy." This does not mean that he could not have adequate supervisory powers over other employees. Respondent contends that Silva had power "responsibly to direct [other employees that was] * * * not of a merely routine or clerical nature, but require[d] the use of independent judgment." Section 2(11). The trial examiner in effect so found. In reversing this conclusion the Board said there was "no evidence that * * * Silva * * * 'responsibly gave instructions to employees.' * * * Silva was merely a conduit for relaying * * * instructions. * * *" We have reviewed the record and do not find the Board's characterization unsupportable.

We come, therefore, to the propriety of the Board's finding that the Peabody store was an appropriate unit. Respondent owns seven supermarkets, hereinafter stores, in an area north of Boston. Some years back an unsuccessful attempt had been made to organize all seven jointly. The present organizational campaign was directed only against Peabody. The Peabody store is the farthest away (30 miles) from Chelmsford, where another store and the principal offices are located. The trial examiner, having discarded Silva's share of the enrollment, had no occasion to pass on the appropriateness of a single store, and made no findings. Respondent says that the Board's finding "ignores substantial parts of the record, and misstates and misconstrues other parts. * * *" Because this statement is certainly correct, we must, regretably, review the record in detail.

The following quoted text, with one paragraph at the end, which we summarize, constitutes the Board's entire findings on the subject of the unit. The footnotes are our additions and comment. The only evidence we recite in the footnotes comes from General Counsel witnesses not stated to be disbelieved, or from employer testimony which was not rejected, directly or indirectly, or impeached, and which appears inherently credible. Chesapeake & Ohio Ry. Co. v. Martin, 1931, 283 U.S. 209, 216, 51 S.Ct. 453, 75 L.Ed. 983. The Board said,

"In the instant case the record reveals the following relevant [3] facts:

"Respondent operates 7 stores in the State of Massachusetts, 4 under the name 'Purity-Sav-More;' 2 under the name Sav-More, and 1 under

---

1. Local 1435, Retail Clerks International Ass'n, AFL-CIO.

2. The Board eliminated the card of a 17-year old part-time employee who the trial examiner found was threatened by one of the organizers, in the presence of other employees, with violence that was barely averted. In confining the elimination to one vote, where the trial examiner had made no findings on that subject, the Board's disregard of what would seem to us the natural effect of such conduct upon other part-time employees of

like age, as well as its refusal to draw inferences of the possibility of similar conduct with respect to other young employees, seems to us very close to impermissible. We would think the reason for requiring secret elections would loom large when such improper union activity was established. Possibly the Board felt that this impropriety was offset by the employer's.

3. If this is a backhanded ruling that all remaining, unmentioned, facts are not relevant, it is clearly erroneous.

the name 'Converse-Sav-More.' The Peabody store is approximately 10 miles from the nearest of the other stores in the chain, and about 30 miles distant from Respondent's main offices. The Peabody store advertises in different area newspapers and circulars which do not list the name and location of all of the stores in the chain.[4] Store hours vary among the 7 stores.[5] The management of each store determines the number of employees required to staff the store.[6] Persons employed in the Peabody store are hired at that store and must fill out an application for employment at the Peabody store.[7] Almost all of the part-time employees, who comprise about 50 percent of the work force at the Peabody store, come from the Peabody area.[8]

"The actual operations of the Peabody store are under the direct control of the store manager and the 'store supervisor,' the latter dividing his time about equally between the Peabody store and another store in the chain.[9] The store supervisor and the manager have direct control over the hiring [10] and discharge [11] of employees; the assignment of work to employees; the approval of work schedules for employees; the approval of time off; and, settlement of customer complaints. Vacation schedules are based upon departmental seniority within the store.[12] The time records of employees of the Peabody store are kept and totaled at Peabody, and forwarded to the main office for payroll purposes.[13] There are four

4. When respondent advertises in Boston papers, all seven stores are mentioned. Respondent also advertises by radio, always listing all seven stores.

5. The hours are determined exclusively by respondent's president, who, incidentally, spends considerable time in each store.

6. We have not discovered the basis for this finding. As we read the testimony it was that the number of employees was determined jointly by the store executive and the local store manager on the basis of volume figures (supplied by the central office) by applying a formula, uniform for all stores, issued by the central office.

7. The sentence should have started with the word "Some." In each store there are four departments, meat, produce, delicatessen, and grocery. Full-time employees in the first three departments are hired at the central office by the pertinent central office executive, who determines which store they will be placed in. Grocery, cashiers, and office help are hired "mostly" by local management. Full and part-time cashiers, however, are trained by central office personnel, who has full say whether they are to be retained. So far as we can discover, the application-filling-out referred to by the Board as a "must" is local only to the extent that the employment may be. Even local employment must be as a result of filling out a uniform application supplied by the central office.

8. We have no criticism of grouping full and part-time employees, but we have the impression that the important corps of employees are the full-timers.

9. The store supervisor is a central office man. In addition to supervising two stores, he has duties with respect to the grocery departments throughout the chain. Neither the manager nor the store supervisor have supervision over meat, produce and delicatessen operations, which are controlled by other central office executives.

10. The extent that this is not so we have already mentioned.

11. The store supervisor, the central office executive, does "nearly all firing." No firing is done at the local level without at least consultation.

12. This is only partially true. The seniority system in the sense of establishing length of vacation is company wide. Individual vacation preferences are asserted at the store level on a local seniority basis, but all lists are cleared through the central office, and when vacations require replacement transfers, conflicts are resolved on the basis of company seniority.

13. The significance of this escapes us. The time records are kept locally only for the current week. The central office makes out the payroll and the pay check of every employee, and accounts for, and keeps records of, all "employment

office employees at the Peabody store who perform clerical work for the Peabody store only.[14]

"Other than fresh meat and dairy products [15] almost all other merchandise is ordered by the individual stores, including the Peabody store, directly from independent warehouses and vendors,[16] with the quantity of merchandise ordered left in large degree to the discretion of the individual store management." [17]

The above constitutes the Board's complete findings, except for a finding that in a two-year period there were a total of 118 employee transfers to or from the Peabody store, a matter which apparently particularly troubled counsel for the General Counsel, and troubles us.[18]

In addition to what we have stated in the footnotes, the Board omitted to mention the following. All merchandise is sold at uniform prices at all the stores.

Special promotional sales are also so conducted. Employee security is handled by a single officer at the central office. All fire, liability and workmen's compensation insurance is contracted for the company as a whole. Finally, and most important, with respect to employees, job classifications, wages, and automatic wage rate steps within each classification, are uniform. So are vacations, holidays, sickness and accident and profit-sharing and retirement programs. There are still further matters, which we find unnecessary to refer to.

■ Whether because the Board relied upon an inadequate summary of the testimony, or for some other reason, respondent's characterization of its opinion, previously quoted, is unfortunately justified.[19] As we have said, fn. 3, if its summary was thought to be, as it was said to be, a statement of "the relevant facts," it certainly was not. If it was a singling out of those particular facts which, in the Board's opinion, justified

security taxes, withholding taxes, deductions, old age or insurance payments."

14. If this is of any significance, the correct number is three.

15. and produce.

16. To the extent that this implies that the individual stores have any discretion as to brands, quality of the goods, the prices to pay, what warehouse or vendors to select, or even what goods to carry, it is erroneous. All of these matters are determined by the central office, which also pays all bills. Finally, the initial words "almost all" conceal the fact that it is "very frequent" for merchandise to be transferred from store to store— a fact about which counsel for the General Counsel expressed concern because the Board had indicated "recently that * * * [it] may become very relevant."

17. Besides determining the particular merchandise, fn. 16, the central office determines the placement, the display and the arrangement of merchandise in every store. Hence the entire meaning of the footnoted phrase is that local management is responsible to see that the shelves do not get empty. The Board's appreciation of the low level of this discretion

may be found in its rejection of the claim that Silva was a supervisor, even though this was part of his duties.

18. Even this finding neglects to mention that some employees regularly divide their basic work week between two or more stores, and that "very frequently" employees work their basic week in one store and overtime in another. It is not clear that the Board's figure included these employees. In any event, the Board failed to note the difference, in the present context, between permanent transfers, and temporary transfers, which latter meant that employees were working in two stores. Exhibit 15 reveals that in the two-year period 50 different employees, excluding supervisors (Exhibit 14), were temporarily in or out of Peabody from or to another store. The regular complement at Peabody was 107.

19. We say "unfortunately," not only for this case, but because counsel in other cases have, in the past, taken far too much encouragement from our occasional reversals of the Board. There is a heavy burden on parties who seek to claim that the Board's findings are not warranted.

treating the Peabody store as a single unit, some of them were so expressed, or limited, as to give the wrong impression, see, e. g., fns. 6, 7, 11, 16; some of them were at least materially incomplete, see, e. g., fns. 4, 9, 10, 12, 18; and some seem almost totally insignificant, see late some facts and omit others, some of e. g., fns. 13, 17. Furthermore, to iso- them at least comparable, and some of seemingly much greater importance than some mentioned, is, per se, a failure to view even the recited facts in context.

In argument before us counsel seeks to justify the Board's decision by stating that employees who wish to unionize should be permitted to do so. We do not question that. Consideration, however, should also be given to the consequences to employees similarly situated who apparently do not wish to unionize, but who would inevitably be affected, basically, by the union's activities. It is only if it is reasonable to regard the employees elsewhere in the chain differently in the light of the total circumstances that there is a true majority vote. We believe, also, that there should be some minimum consideration given to the employer's side of the picture, the feasibility, and the disruptive effects of piecemeal unionization. Congress' appreciation of these factors we believe is evidenced by its passage of section 9(c) (5) to the effect that the extent of organization is not the sole consideration. N. L. R. B. v. Metropolitan Life Ins. Co., 1965, 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951.

When the record is viewed as a whole, other than the obvious geographical separation, which is itself by no means complete, in our opinion it would be difficult to find a more integrated operation, or less difference among employees. We take it, however, N. L. R. B. v. Metropolitan Life Ins. Co., supra, that this is not the occasion for us to determine that the Board should not have found the unit appropriate even if we should feel so. We merely decline to enforce its order, and remand for further proceedings.