**BIG Y FOODS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 80–1578.

United States Court of Appeals, First Circuit.

Argued March 4, 1981.

Decided June 11, 1981.

Jay S. Siegel, Hartford, Conn., with whom Edward S. G. Hicks, Jr., and Siegel, O'Connor & Kainen, P. C., Hartford, Conn., were on brief, for petitioner.

Sharon Margolis Apfel, Atty., Washington, D. C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Peter M. Bernstein, Atty., Washington, D. C., were on brief, for respondent.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, and WYZANSKI, Senior District Judge.*

WYZANSKI, Senior District Judge.

This case is before the Court on a petition to review and set aside an order of the National Labor Relations Board ("NLRB") based upon alleged violations of §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("Act"), 29 U.S.C. §§ 151–68, directing the petitioner, Big Y Foods, Inc. ("the Company") to bargain with the Amalgamated Meat Cutters, Food Handlers and Affiliated Workers of North America, Local Union 33, a/w Amalgamated Meat Cutters and Butcher Workers of North America, AFL–CIO ("Meat Cutters") which was certified, following an election, as the representatives of meat department employees in 11 of the Company's stores. The Board had cross-petitioned for enforcement of its decision and order.

The Company contends that the order is invalid because a unit of employees in the meat departments of the Company's 11 stores does not constitute an appropriate bargaining unit within the meaning of Section 9(b) of the Act.

The proceedings before the NLRB began when on August 16, 1971 the Retail Store Employees Union, Local 1459, Retail Clerks International Association, AFL–CIO ("Retail Clerks") filed in Case 1–RC–11708 a petition seeking to represent an overall unit

---

* Of the District of Massachusetts, sitting by designation.

of grocery and meat department employees at the Company's 11 unrepresented stores. On August 16, 1976 the Meat Cutters filed in Case 1–RC–14664 a petition seeking to represent a unit limited to the Company's meat department employees at the same 11 unrepresented stores. On September 22, 1976 the NLRB's Regional Director ordered a consolidation of the two cases. Thereafter, he held a hearing at which there was evidence to the following effect.

The Company, a Massachusetts corporation, operates in Western Massachusetts a chain of 16 supermarkets for the retail sale of meats, groceries, and other food products.

Before the petitions were filed with the NLRB none of the employees in 11 of those stores had been represented for collective bargaining. There are employed in those 11 stores 850 to 1,000 persons, of whom 72 are the so-called "meat department employees" involved in this case. That group breaks down into 11 head meat cutters, 8 meat cutters, 18 apprentice meat cutters, and 35 meat wrappers and clerks.

In 5 of the Company's stores not covered by the petitions the employees in all departments have been for 10 years covered by collective bargains between their representative, Meat Cutters Union, and the Company.

The Company is centrally operated. The administrative activities of all 16 stores and their records are handled exclusively at the central office. Virtually every major management decision concerning the stores—including labor relations policies, advertising, merchandising, pricing, physical layout of the stores, hours of operation, hiring, wage scales, promotions, discipline and transfers—are under the direct control and supervision of the personnel in the central office. That office employs specialists for each department who not only coordinate purchasing, but also regularly visit the stores in order to supervise merchandising and, in general, oversee the operation of the various departments. In this latter respect, these specialists work in conjunction with the store managers.

All the employees in the 11 unrepresented stores receive the same fringe benefits such as leave time, holidays and insurance. Seniority for layoff purposes and benefit levels is based on service in all departments. Working hours for all employees are the same.

All the foregoing policies and procedures apply to employees in the meat department of the 11 stores as well as to other employees.

The meat department in each store is the only department that has a formal apprenticeship program. Under it, employees, a number of whom began as meat clerks, are trained as meat cutters primarily by on-the-job training. Substantially higher wages are paid to meat cutters than to meat clerks.

Meat *cutters* are not trained to work in other departments, are never transferred temporarily or permanently to other departments, and have little contact with employees of other departments.

Meat *clerks* may be transferred to serve permanently or temporarily in other departments. When in the meat department, they work in close association with meat cutters; they clean equipment used in the meat department, process some meat, wrap meat, receive customers' requests for special cuts, supply new product to cutters, and stock meat in display cases. When transferred to other departments, meat clerks are associated with and do work similar to clerks regularly employed in those departments.

Not only may meat clerks serve either permanently or temporarily in other departments, but clerks from other departments may serve permanently or temporarily in the meat department. Each transfer which is in excess of 30 days is called "permanent"; transfers for shorter periods of service are called "temporary."

In the year 1974 there were permanent transfers *from* the meat department of 5 persons (of whom one, Lowell, had earlier in the year been transferred from the delicatessen department) and *to* the meat department of 41 persons. In the year 1975 there

were permanent transfers *from* the meat department of 5 persons and *to* the meat department of 41 persons. In the year 1976 up to September 25, there were permanent transfers *from* the meat department of 25 persons (of whom some had earlier been transferred from other departments to the meat department) and *to* the meat department of 22 persons (of whom some had earlier been transferred from the meat department to other departments). See Exs. 6, 7, and 8.

With respect to temporary transfers, Ex. 9 shows that there were in 1976 up to August 16, 1976 1,353 interdepartmental interchanges between the meat department and other departments. Interchanges occurred almost every week. Some of the transfers were for only a few hours.

After taking the foregoing evidence, the Regional Director transferred the case to the Board.

On September 29, 1978 the Board issued its Decision and Direction of Elections. It did not purport finally to exercise its powers under § 9(b) of the Act.[1] Instead, it *found that for purposes of collective bargaining,* "the meat department employees at the Employer's 11 unrepresented stores . . . *may* constitute *an* appropriate unit" (emphasis added) and "a storewide unit, including the meat department, *would* also be appropriate" (emphasis added) (A. 8–9, fourth paragraph). The decision then directed the creation of two voting groups: Unit A, including all meat department employees in the 11 stores who "shall vote whether they desire to be represented by Meat Cutters, Retail Clerks, or no union"; and Unit B, including all other employees in the 11 stores who "shall vote whether or not they desire to be represented by Retail Clerks." (A.14) The only other now relevant direction by the Board provided that: "If the majority of the employees in voting group A select Meat Cutters, they shall be deemed to have indicated their desire to constitute a separate bargaining unit, and

the Regional Director shall issue a certification of representative for such group, which the Board under the circumstances finds to be an appropriate unit for collective bargaining." (A.14)

On November 3, 1978, the Retail Clerks, reciting that they and the Meat Cutters "have reached agreement on a merger," filed a motion to amend the Direction of Elections, requesting that its name be withdrawn from the ballot in Unit A and that separate elections be conducted in the two units. The Company filed an objection to the motion. On December 29, 1978, the Board issued an Order and Amended Direction of Elections granting the Retail Clerks' motion to withdraw from the ballot. Thereafter, on January 23, 1979, the Retail Clerks requested that its petition in Case 1–RC–11708 be withdrawn entirely.

On January 26, 1979, a secret ballot election in Unit A was conducted pursuant to the Board's Order. The Union won the election by a vote of 34 to 30, with 2 challenged ballots. On February 1, 1979, the Regional Director issued an order severing cases and permitting withdrawal of the Retail Clerks' petition with prejudice, thus eliminating the election in Unit B.

On January 2, 1980, the Board issued its Decision and Certification of Representative certifying the Union as the collective bargaining representative of the Company's meat department employees.

Following its certification, the Union requested that the Company commence collective bargaining, but the Company refused. Thereafter, the Union filed an unfair labor practice charge and, on March 26, 1980, the Board's Regional Director issued a complaint alleging that the Company had refused to bargain in violation of Section 8(a)(5) and (1) of the Act. In its answer, the Company admitted its refusal to bargain, but challenged the validity of the Board's certification on the ground that the bargaining unit was inappropriate. On April 28, 1980, the General Counsel moved for

---

1. The NLRB recited in its September 29, 1978 decision ". . . we make no final unit determination at this time, but we shall first ascertain the

desires of the employees as expressed in the elections directed below." (A.9)

summary judgment. On August 28, 1980, the Board granted the General Counsel's motion for summary judgment, found that the Company had violated Section 8(a)(5) and (1) of the Act by refusing to bargain with the Union after it had been certified as the bargaining agent in an appropriate unit, and ordered the Company to cease and desist from engaging in the unfair labor practice found and to bargain with the Union upon request.

The Company petitions this court to set aside the Board's August 28, 1980 order on the ground that the Board's January 2, 1980 certification determining that the appropriate unit for collective bargaining consisted of the employees in the meat department of the Company's 11 unrepresented stores was arbitrary, capricious, an abuse of discretion, and lacking in substantial evidentiary support and that therefore the Board's August 28, 1980 order is invalid.

1. The NLRB's authority to determine the appropriate unit rests on § 9(b) of the Act, 29 U.S.C. § 159(b) which provides that:

"The Board shall decide *in each case* whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this Act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof . . . ." (Emphasis added.)

With respect to § 9(b)[2], the Supreme Court in *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 491–492, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947) held that:

"The issue as to what unit is appropriate for bargaining is one for which no absolute rule of law is laid down by statute, and none should be by decision. It involves of necessity a large measure of informed discretion, and the decision of the Board, if not final, is rarely to be disturbed. While we do not say that a determination of a unit of representation cannot be so unreasonable and arbitrary as to exceed the Board's power, we are clear that the decision in question does not do so. That settled, our power is at an end."

■ A court may set aside an NLRB § 9(b) determination only if the Board has not disclosed the basis of its determination,[3] or the determination is not supported by substantial evidence,[4] or the determination is in violation of the Act,[5] or some other statute or the Constitution, or is arbitrary or unreasonable.[6]

2. The Company contends that "the mechanical application of an invalid legal 'presumption' was used to determine the unit in question."

We reject the contention.

■ In no sense did the NLRB proceed mechanically. Adhering to the principle set forth in *Mock Road Super Duper, Inc.*, 156 NLRB 983, 984 (1966) [order enforced in *NLRB v. Mock Road Super Duper, Inc.*, 393 F.2d 432 (6th Cir. 1968)] that "as in other industries, the determination of the appropriate unit in the retail food industry must rest upon analysis of all the relevant factors,"—the NLRB in its September 29, 1978

**2.** *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947) interpreted § 9(b) as originally enacted by the Act of July 5, 1935, 49 Stat. 453. That interpretation applies to § 9(b) as amended. *South Prairie Construction Co. v. Local No. 627, International Union of Operating Engineers*, 425 U.S. 800, 805, 96 S.Ct. 1842, 1844, 48 L.Ed.2d 382 (1976).

**3.** *NLRB v. Metropolitan Life Ins. Co.*, 380 U.S. 438, 443–444, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951 (1965).

**4.** *South Prairie Constr. Co. v. Local 627*, 425 U.S. 800, 803, 96 S.Ct. 1842, 1843, 48 L.Ed.2d 382 (1976).

**5.** *Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 170–172, 92 S.Ct. 383, 393–394, 30 L.Ed.2d 341 (1971).

**6.** *Ibid.; Packard Motor Car Co. v. NLRB, supra; Banco Credito y Ahorro Ponceno v. NLRB*, 390 F.2d 110, 112 (1st Cir. 1968), *cert. den.*, 393 U.S. 832, 89 S.Ct. 101, 21 L.Ed.2d 102 (1968); *NLRB v. Mock Road Super Duper, Inc.*, 393 F.2d 432, 434 (6th Cir. 1968).

decision considered [7] each of the factors relevant to the determination of an appropriate unit in this case.

Nonetheless, the Company is correct in charging that the NLRB used a "presumption" to determine the unit question. After setting forth some factors favorable to an overall or storeswide unit, the Board stated:

> Notwithstanding these factors which would appear to militate in favor of an overall employee unit, it is well settled that a separate meat department unit is *presumptively* appropriate. (See, e. g., *Quality Markets, Inc.*, 129 NLRB 904 (1960); *Hy-Vee Food Stores, Inc.*, 176 NLRB 54, 60 (1969), and cases cited therein.) In order to determine whether the *presumption* survives or is *rebutted* on a particular set of facts, a number of factors must be considered. (A. 6). (parenthetical material appears in the original text as a footnote; emphasis added.)

After considering further factors, the NLRB made the following finding:

> In consideration of the foregoing, we find that the Employer has failed to *rebut* the *presumptive* appropriateness of a meat department unit. We find, therefore, that the meat department employees at the Employer's unrepresented stores, including the head meatcutters, meatcutters, apprentice meatcutters, and meat clerks and wrappers, may constitute an appropriate unit for the purposes of collective bargaining. (A. 8), (footnotes omitted; emphasis added.)

Those quotations show that the NLRB applied a presumption under which an NLRB finding that a meat department exists in a multi-department retail food store justifies a determination that the meat department is an appropriate unit unless an opponent proves that in the particular circumstances it is not an appropriate unit. This presumption is a substantive, not a procedural, presumption such as is set forth in F. Rules Ev. 301; it is a rebuttable, not a conclusive, or, as is sometimes said, e. g. in *NLRB v. St. Francis Hospital of Lynwood*, 601 F.2d 404, 414 (9th Cir. 1979), a *per se* presumption; unless rebutted, it leads from a proved fact or set of facts directly to an administrative determination,[8] and not merely to a presumed fact intermediate to a final decision, such as the presumptions involved in *Leary v. United States*, 395 U.S. 6, 32–54, 89 S.Ct. 1532, 1546–1557, 23 L.Ed.2d 57 (1969). It does no more than to shift the burden of proof. *NLRB v. Baptist Hospital, Inc.*, 442 U.S. 773, 781, 99 S.Ct. 2598, 2603, 61 L.Ed.2d 251 (1979).

This presumption is subject to judicial review "for consistency with the Act, and for rationality." *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370; *NLRB v. Baptist Hospital Inc., supra*, 442 U.S. 787, 99 S.Ct. 2606.

■ The Act vests in the NLRB extraordinarily broad discretionary powers to decide the appropriate unit. See *Packard Motor Car Co. v. NLRB, supra*. The only pertinent limitation is the § 9(b) statutory direction to the NLRB to make a decision

---

7. The text of the NLRB's September 29, 1978 decision shows that in determining that the meat department was an appropriate unit, the Board considered that the Company's entire chain is centrally operated, that its personnel policies are centrally developed and administered, that all employees receive the same fringe benefits, that only the meat department has a formal apprenticeship program, that meat cutters and apprentice meat cutters receive higher wages than clerks, that meat cutters are never permanently or temporarily transferred out of the meat department and have almost no contact with employees of other departments, that the work of meat clerks is closely integrated with the work of meat cutters, that permanent transfers of meat clerks to other areas of the store are relatively infrequent, and that it is not uncommon for a meat department clerk who had been transferred to be reassigned, and that there was no bargaining history involving the employees of the 11 stores.

8. Under Professor J. R. Thayer's classification originally made in a pamphlet on The Presumption of Innocence and now available in 2 Bouvier's Law Dictionary (1914) 2679, the presumption in the case at bar is a presumption of the third type, that is, one "where a fact or set of facts makes out a case which shall stand until overthrown by a specific quantity of evidence . . . ."

"in each case." *NLRB v. St. Francis Hospital, supra; Long Island College Hospital v. NLRB*, 566 F.2d 833, 840–41 (2nd Cir. 1977), cert. den., 435 U.S. 996, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978); *Memorial Hospital of Roxborough v. NLRB*, 545 F.2d 351, 360–362 (3rd Cir. 1976). It has been held that that statutory direction invalidates a conclusive presumption because it precludes the NLRB from making a determination based upon the unique circumstances of a particular group of employees. *NLRB v. St. Francis Hospital, supra.* But that statutory direction does not invalidate a rebuttable presumption which has no such preclusive effect.

■ "The validity of a presumption depends upon the rationality between what is proved and what is inferred." *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 804–805, 65 S.Ct. 982, 988–989, 89 L.Ed. 1372; *Beth Israel Hospital v. NLRB, supra*, 437 U.S. 511, 98 S.Ct. 2478; *NLRB v. Baptist Hospital, Inc., supra*, 442 U.S. 787, 99 S.Ct. 2606. Where an NLRB presumption reflects the Board's experience in similar cases, it is likely to be rational. *Republic Aviation Corp., v. NLRB, supra.*

The reasonableness of a presumption may be proved by matters other than the testimonial evidence in the case in which the presumption is used. *Leary v. United States*, 395 U.S. 6, 32–34, 89 S.Ct. 1532, 1546–1547, 23 L.Ed.2d 57 (1969); *NLRB v. Metropolitan Life Ins. Co., supra* ;[9] *Memorial Hospital of Roxborough v. NLRB, supra*, 357.

9. *NLRB v. Metropolitan Life Ins. Co.*, 380 U.S. 438, 443, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951 (1965) held that "In articulating the 'basis for its order,' the Board is free to refer 'to other decisions or its general policies laid down in its rules and its annual reports." *Id.* at 443 n.6; 85 S.Ct. at 1064.

10. Before its September 29, 1978 decision, the NLRB had had a large number of cases involving meat departments in multi-department stores. The overwhelming majority of those cases resulted in a determination that the meat department was, within the meaning of § 9(b), "the unit appropriate." See, e. g., *Quality Markets, Inc.*, 129 NLRB 904, 905 (1960); *Mock Road Super Duper, Inc.*, 156 NLRB 983 (1966) [order enforced in *NLRB v. Mock Road Super Duper, Inc.*, 393 F.2d 432 (6th Cir. 1968)];

The reasonableness of this presumption is demonstrated both by the two cases—*Quality Markets, Inc.* and *Hy-Vee Food Stores, Inc.*, both *supra* —which the NLRB cited as the basis of its presumption—and by myriad cases to the same effect—all revealing "the emerging bargaining trend in the retail food industry generally, whereby grocery employees and meat department employees are represented in separate units."[10] *R.N. Market, Inc.*, 190 NLRB 292 (1971).

*NLRB v. Purity Food Stores, Inc.*, 376 F.2d 497, 501 (1st Cir. 1967) upon which the Company relies for its statement that the presumption in the case at bar is "invalid" is plainly distinguishable. Judge Woodbury, in holding that the NLRB had not articulated substantial reasons for its determination of an appropriate unit, said that "a simple declaration that single store units are considered 'presumptively appropriate' adds nothing" to the NLRB's decision. If we assume that in *Purity Foods* the NLRB did invoke a presumption that a single store unit was an appropriate unit, the NLRB failed to show that there were supporting facts in our outside the record which made the presumption reasonable. Indeed, Judge Woodbury stated that the only relevant case indicated that the single store was not an appropriate unit.

■ 3. The Company contends that the Board was unreasonable in not giving any

*Priced-Less Discount Foods, Inc., d/b/a Payless*, 157 NLRB 1143 (1966); *The Great Atlantic & Pacific Tea Co., Inc.*, 162 NLRB 1182 (1967); *Allied Super Markets, Inc.*, 167 NLRB 361 (1967); *Big Y Supermarkets*, 161 NLRB 1263, 1268 (1966); *Hy-Vee Food Stores, Inc.*, 176 NLRB 54, 60 (1969) [order enforced in *Hy-Vee Food Stores, Inc. v. NLRB*, 426 F.2d 763 (8th Cir. 1970)] ("the Board has traditionally held separate meat departments to be appropriate units"); *Primrose Super Market of Malden, Inc.*, 178 NLRB 566 (1969); *R. N. Market, Inc.*, 190 NLRB 292 (1971); *C & E Stores, Inc.*, 229 NLRB 1250 (1977) ("The Board has normally found appropriate a unit of grocery employees excluding meat department employees.")

weight to the over 10-year successful bargaining history between the Company and the Meat Cutters as representative of the employees in the 5 stores not involved in these proceedings. The NLRB in its September 29, 1978 opinion gave the obviously correct answer to that contention: what the Company and the Meat Cutters did with respect to employees in 5 stores acquired from Growers Outlet is not part of the bargaining history of the employees in the instant case.

4. The Company places great emphasis on its contention that the NLRB has minimized the importance of the transfer of employees from and to the meat department. For the following reasons we reject that contention.

██ The significance of the transfers is to be measured against the framework of the pleadings. The NLRB had before it petitions seeking a determination as to only an alternative between a unit composed of all meat department employees and a unit composed of all employees in all 11 stores; no one proposed that meat clerks should be a separate unit.

In that framework, the majority of the meat department consisted of meat cutters who were never transferred temporarily or permanently. There was no evidence as to what percentage of the individuals regularly employed as meat clerks was transferred out of the meat department temporarily or permanently.[11] There was no evidence as to what percentage of a transferred meat clerk's time annually was spent away from the meat department. There was no evidence that any transferred meat clerk failed to return to the meat department. There were corresponding gaps in the evidence with respect to individuals regularly employed in other departments who were transferred to the meat departments. Thus the evidence as to the transfers came down to a showing that a substantial number of meat clerks spent part of their time in other departments and a substantial number of clerks from other departments spent part of their time in the meat department.

If the NLRB's finding that the "interchange between meat clerks and personnel in the other four areas of the stores . . . . is minimal at best and generally occurs on an emergency basis" had meant that there was only a small number of people involved, the finding would be false, especially in light of 1,353 temporary transfers in the first 7½ months of 1976. However, the finding was made in a context in which the NLRB was looking at the effect of temporary transfers upon the meat clerks, not upon the employer. With respect to meat clerks, there were many reasons why the NLRB was justified in finding that the temporary transfers were of minimal significance: the relevant exhibit, Ex. 9, showed nothing more than that to meet emergencies an uncounted number of meat clerks had been transferred in an uncounted number of transfers for an uncounted percentage of each transferred meat clerk's annual working time; there was no proof that any transferred meat clerk remained out of the meat department; it was not at once apparent how many meat clerks were involved in the transfers; more important, it was not indicated how many of the persons regularly employed as meat clerks in the meat department were never transferred; and there was a corresponding want of clear proof as to the number and percentage of clerks from other departments who were transferred to the meat department. So far as it appears, only a fringe element of meat clerks was involved in the transfers, and that fringe element of meat clerks had no roots in other departments. Nor was it shown that a large percentage of clerks from other departments had contact with meat clerks.

The Company cannot rightly claim that the NLRB failed to give full and fair consideration to the magnitude of the transfers as viewed from the employer's angle. Aware that the Company saw the transfers as indicative of managerial integration of

---

11. The figures with respect to "permanent" transfers show only how many individuals were transferred but do not show how many were not. The figures as to temporary transfers do not even make clear how many individuals were transferred.

the 11 stores, the NLRB in its September 29, 1978 decision recited that: "The record indicates that interdepartmental transfers, both temporary and permanent, occur and that certain meat department personnel have been involved in these transfers." The NLRB then explicitly ruled that that was one of the "factors" which would "appear to militate in favor of an overall employee unit." (A.5)

It was not unreasonable for the NLRB in determining the appropriate unit to give greater weight to the views of employees—whether meat cutters or meat clerks or both—than to the views of the employer as to the importance of the transfers. Particularly in light of the § 9(b) declaration that the NLRB is to "decide each case . . . in order to assure to employees the fullest freedom in exercising the rights guaranteed by this Act," the Board is entitled to give greater weight to the employees' than to the employer's view of the appropriate boundaries of the unit.[12] Nothing that we held or said in *NLRB v. Purity Food Stores, Inc.*, 354 F.2d 926, 931 (1st Cir. 1965) is to the contrary. There we merely indicated that "We believe, also, that there should be *some minimum* consideration given to the employer's side of the picture, the feasibility, and disruptive effects of piecemeal unionization." (Emphasis added.)

We conclude that the NLRB was not unreasonable in not having given greater weight to the Company's view of the transfers of employees between the meat department and other departments.[13] Whether we ourselves would have done so is wholly irrelevant; all that we as a reviewing court are authorized to consider is whether the administrative agency failed to give fair and reasonable consideration to the relevant factors; the weight assigned by the agency to each factor it has fairly considered is a matter for it to determine. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–465, 95 L.Ed. 456 (1951); *Vermont Yankee Nuclear Power v. NRDC*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978); *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227–228, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980).

5. The NLRB was not arbitrary in not applying in the instant case its holding in *Pueblo International, Inc. d/b/a Pueblo and Local 568, Amalgamated Meat Cutters and Butcher Workmen of Puerto Rico, AFL–CIO*, 203 NLRB 629, 83 LRRM 1154 (1973). In that case the critical fact—wholly absent from the instant case—was that the employees there involved had a history of collective bargaining as part of an established multi-department unit.

■ 6. The Company's contention that § 9(c)(5) has a bearing on this case has no merit inasmuch as "the extent to which the employees had been organized" was not one of the factors which the NLRB considered in making its determination. Whatever may have been the agreements between the Meat Cutters union and the Retail Clerks union, the NLRB did not take them into account in deciding that the Meat Department was the appropriate unit.

---

12. In *NLRB v. The Western and Southern Life Ins. Co.*, 391 F.2d 119, 123 (3 Cir. 1968), it was held

"... that the overriding policy of the Act is in favor of the interest in employees to be represented by a representative of their own choosing for the purposes of collective bargaining, and the Board was entitled to give their interest greater weight than that accorded to the employer in bargaining with the largest, and presumably most convenient possible unit . . . ."

This principle was followed in *Michigan Hospital Service Corp. v. NLRB*, 472 F.2d 293–296 (6th Cir. 1972).

13. *Yaohan of California, Inc.*, 252 NLRB, No. 50, 105 LRRM 1592 (1980) and *Ashcraft's Market*, 246 NLRB No. 68, 102 LRRM 1592 (1979) upon which the Company relies do not show that the NLRB acted unreasonably in the instant case. In those cases the limited functions of the meat cutters, the absence of an apprentice program, and adequate proof of how an extensive interchange of meat department and other employees affected the percentage of a meat clerk's time spent out of the meat department constituted special circumstances not present here. The factual differences in the cases justified the NLRB in reaching different determinations of the appropriate unit.

*Petition of Big Y Foods, Inc. denied.*
*Petition of NLRB granted.*