652 F.2d 202
 107 L.R.R.M. (BNA) 3099, 91 Lab.Cas. P 12,852
 MARRIOTT IN-FLITE SERVICES, A DIVISION OF MARRIOTT
CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Teamsters Local Union No. 25 A/W International Brotherhood
of Teamsters, Chauffeurs, Warehousemen & Helpers
of America, Intervenor.
 No. 80-1723.
 United States Court of Appeals,
First Circuit.
 Argued April 8, 1981.
Decided June 23, 1981.
 
 Carlton James Trosclair, Washington, D. C., with whom Holly A. Silver, Washington, D. C. was on brief, for petitioner.
 Gabriel O. Dumont, Jr., Boston, Mass., with whom James T. Grady and Grady & McDonald, Boston, Mass., were on brief, for intervenor.
 Barbara Gehring, Atty., Washington, D. C. with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Andrew F. Tranovich and R. Michael Smith, Attys., Washington, D. C., were on brief, for respondent.
 Before CAMPBELL, BOWNES and BREYER, Circuit Judges.
 BOWNES, Circuit Judge.
 
 
 1
 Petitioner Marriott In-Flite Services, a division of the Marriott Corporation, has petitioned us to review and set aside an order of respondent National Labor Relations Board requiring Marriott In-Flite to bargain collectively with intervenor Teamsters Local Union No. 25 as the exclusive bargaining representative of a unit composed of transportation department employees at the company's East Boston facility. The Board has requested that we enforce its order. For the reasons stated below, we deny the petition of Marriott In-Flite and enforce the order of the National Labor Relations Board.I.
 
 
 2
 Marriott In-Flite operates a food and beverage catering service for airlines[1] out of a facility at Logan International Airport in East Boston, Massachusetts. On February 12, 1980, Teamsters Local Union No. 25, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, filed a representation petition with the Board seeking certification as the collective bargaining representative of the food and equipment handlers, food and equipment helpers, coordinators, and automobile mechanics employed in Marriott In-Flite's transportation department in East Boston, some 84 employees. Marriott In-Flite urged that the Board endorse a plant-wide production and maintenance unit comprising approximately 254 employees, including not only the employees of the transportation department, but also such groups as cooks, chefs, lead porters, storekeepers, and utility/sanitation employees. Following a hearing conducted by a hearing officer of the Board, the Acting Regional Director found an appropriate unit[2] to be
 
 
 3
 (a)ll transportation department employees of the Employer located at its One Wood Island Park, East Boston, Massachusetts facility including food and equipment handlers, helpers, coordinators and auto mechanics but excluding all other commisary (sic ) employees, office clerical employees, guards and supervisors as defined in the Act. (footnotes omitted).
 
 
 4
 Marriott In-Flite then filed a Request for Review of this unit determination, arguing again that a plant-wide unit was appropriate. This request was denied and an election was held; the union won by a vote of 48 to 35[3] and was certified on May 16, 1980, as the exclusive bargaining representative for the handlers, helpers, coordinators, and automobile mechanics. In order to test this certification, Marriott In-Flite refused to bargain with the union. As a result, the Regional Director filed a complaint charging that the actions of Marriott In-Flite constituted unfair labor practices within the meaning of §§ 8(a)(1)[4] and (5)[5] of the National Labor Relations Act. The Board transferred the case to itself, found that Marriott In-Flite had violated §§ 8(a)(1) and (5), and issued the order contested here.
 
 II.
 
 5
 The Board's authority to determine an appropriate unit for collective bargaining stems from § 9(b) of the National Labor Relations Act, which provides that:
 
 
 6
 The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof(.)
 
 
 7
 29 U.S.C. § 159(b). The Supreme Court has noted that § 9(b)
 
 
 8
 confers upon the Board a broad discretion to determine appropriate units.... Our power of review also is circumscribed by the provision that findings of the Board as to the facts, if supported by evidence, shall be conclusive.... So we have power only to determine whether there is substantial evidence to support the Board, or its order oversteps the law.
 
 
 9
 ... The issue as to what unit is appropriate for bargaining is one for which no absolute rule of law is laid down by statute, and none should be by decision. It involves of necessity a large measure of informed discretion, and the decision of the Board, if not final, is rarely to be disturbed.
 
 
 10
 Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947) (citations omitted).[6] Under § 9(b), the unit need not be the only appropriate unit or the most appropriate unit; it must only be an appropriate unit. E. g., NLRB v. J.C. Penney Co., 620 F.2d 718, 719 (9th Cir. 1980); MPC Restaurant Corp. v. NLRB, 481 F.2d 75, 78 (2d Cir. 1973); see Banco Credito y Ahorro Ponceno v. NLRB, 390 F.2d 110, 112 (1st cir.) (per curiam) (employer must show unit designated by Board is clearly not appropriate), cert. denied, 393 U.S. 832, 89 S.Ct. 101, 21 L.Ed.2d 102 (1968). We may overturn the Board's § 9(b) unit determination only if the determination is not supported by substantial evidence, if its basis has not been disclosed, if it is in violation of the Act or some other statute or the Constitution, or if it is arbitrary or unreasonable. Big Y Foods, Inc. v. NLRB, 651 F.2d 40, 44 (1st Cir. 1981).
 
 III.
 
 11
 In order to apply the law properly in this case, we must describe the organization and operation of the East Boston facility in some detail. Testimony at the hearing established that production at Marriott In-Flite begins when the storekeepers receive merchandise and funnel it to holding or storage areas. Production consists of both hot and cold food processing areas; the former is staffed by chefs, lead cooks, and cooks, and both are staffed by station attendants who prepare and package all but the simplest[7] meals or snacks, place the meals or snacks on trays, arrange the trays on carriers, and move the carriers to designated holding areas. The remainder of the production department encompasses utility employees, who wash equipment and utensils from flights; porters, who perform janitorial jobs; house mechanics, who repair production equipment and perform such chores as simple painting, plumbing, and building maintenance; and dispatchers, who are responsible for obtaining passenger counts from the airlines and, when feasible, for notifying the food department and the handlers of these counts.
 
 
 12
 The transportation department, which the Board found to be an appropriate bargaining unit, is, as noted, composed of handlers, helpers, coordinators, and auto mechanics. Handlers[8] and helpers, who work in two-person teams, are responsible for servicing the flights. After learning the passenger counts for the flights that they will stock, a handler and helper pick up the previously-packed carriers at the handling areas, assemble utensils, liquor, and ice as needed, place the material on dollies, and wheel the dollies onto the loading dock where they load their vehicle. From the dock, the team drives to the airport terminals and loads the planes with food and clean equipment.[9] While on the airfield the team will often strip aircraft of used utensils and equipment. The distance to the terminals from Marriott In-Flite's facility varies from one-half mile to almost two miles; maximum driving time is eight to ten minutes. After completing their work on the field, the handler and helper return to Marriott In-Flite to unload the soiled equipment, transport it to the dirty equipment area, and report to dispatch for new passenger counts.
 
 
 13
 The second component of the transportation department, the coordinators, check the loads while they are on the dock to ensure that they are complete and often check with the airlines to ensure that they are satisfied. As their title suggests, these employees coordinate loading with the gate agents and, on some occasions, stand by to see if it will be necessary to add meals. They are also responsible for setting up their own "bank meals," usually previously packed by a production shift, to cover a possible shortfall of meals on a flight. Certain helpers and handlers known as "bankmen" also stand by to add or remove meals from planes, supplying what is necessary from the small trucks that they drive.
 
 
 14
 The auto mechanics, who are responsible for maintaining the department's vehicles, work either at the Jeffries Street location or in a maintenance area adjacent to the loading dock at One Wood Island Park.
 
 IV.
 
 15
 To support their respective positions, each party stresses different characteristics of the One Wood Island Park operation. Marriott In-Flite points out that all employees are paid by the hour, receive the same overtime premiums, are entitled to the same fringe benefits and vacation leave as determined by the company's corporate headquarters, punch in on the same time clock, receive their uniforms from their employer, and are provided meals in the same cafeteria. The facility is under one general manager, although it appears undisputed that a single operations manager has exclusive responsibility for the handlers, helpers, coordinators, and mechanics. The employer emphasizes that the handlers, helpers, and coordinators spend 50% or more of their time working inside the facility alongside the excluded employees, moving through all parts of the kitchen, assembling and in some cases preparing certain foods and drinks, and handling airline utensils and equipment. They share with the sanitation workers responsibility for cleaning the dock area and removing equipment and food from the trucks when they return from the airfield and also come into contact with these workers when collecting clean equipment from the sanitation area. Marriott In-Flite argues that the work of the handlers, helpers, and coordinators is an integral part of the production process.
 
 
 16
 The Board stresses that the handlers, helpers, and coordinators spend approximately 50% of their work day away from Marriott In-Flite's kitchen facilities, and the rest of their work day loading and unloading their trucks or monitoring the loading process. Their presence in the facility's kitchen and their contact with the other employees is characterized as sporadic and incidental to their driving function. Similarly, the automobile mechanics have little contact and no job function overlap with employees not in the unit. Food and equipment handlers, coordinators, mechanics, and some helpers are licensed by the agency that operates the airport to drive onto the airfield. Most of the handlers and coordinators are also issued a license by one of the airlines that Marriott In-Flite services. Unlike other employees, the members of the transportation department must wear photo identification.
 
 
 17
 Employees in the designated unit also have substantially higher wages than all nonunit employees but chefs, cooks, and in-house mechanics,[10] and generally are promoted separately, undergo special training not required of other employees, bid for work schedules with priority based on transportation department seniority, and often deal directly with representatives from the employer's airline accounts. Only 10% to 20% of the helpers were hired from the food production department; most were new employees.[11] Interchange between these and other facility employees is minimal; only two porters have been trained to substitute as helpers in an emergency.
 
 V.
 
 18
 In determining an appropriate unit, the Board evaluates considerations that tend to show the presence or absence of a community of interest among the employees in the requested unit, including the common experience, duties, wages, hours, and other working conditions of the employees, the organization of the business, and any history of collective bargaining. E. H. Koester Bakery Co., 136 N.L.R.B. 1006, 1009 (1962). Because most of the members of the transportation department spend a substantial amount of their time driving or riding on trucks, both parties agree that the analysis set forth in Koester to deal with the dual community of interest that often distinguishes truckdrivers from other classifications of employees is appropriate.[12] In Koester the Board stated that:
 
 
 19
 In our evaluation we shall consider, among others, the following factors: (1) Whether they (the employees) have related or diverse duties, mode of compensation, hours, supervision, and other conditions of employment; and (2) whether they are engaged in the same or related production process or operation, or spend a substantial portion of their time in such production or adjunct activities. If the interests shared with other employees is sufficient to warrant their inclusion, we shall include the truckdrivers in the more comprehensive unit. If, on the other hand, truckdrivers are shown to have such a diversity of interest from those of other employees as to negate any mutuality of interest between the two groups, we shall exclude them.
 
 
 20
 Id. at 1011.
 
 
 21
 Here the Board took official notice of the record below, including the stenographic recording of the hearing and the decision of the Acting Regional Director. In his Decision and Direction of Election, the Acting Regional Director considered just such factors, discussing the duties of all the employees, particularly those of the members of the transportation department, the method of compensating the employees, the supervision of the designated unit, the separate method of promotion and job assignment in the new unit, and the special training required of its members. On the basis of these and other considerations, the Acting Regional Director found that the employees of the transportation department comprised a homogeneous group sharing a community of interest distinct from that of other employees at Marriott In-Flite's East Boston facility.
 
 
 22
 Although the facts in this case are close and although we might not decide upon the same unit based upon these facts, the Board's unit determination involved "a large measure of informed discretion" and is supported by substantial evidence; it should not be disturbed. Packard Motor Car Co. v. NLRB, 330 U.S. at 491, 67 S.Ct. at 793 (1947).[13]
 
 VI.
 
 23
 In a further effort to undermine the decision of the Board, Marriott In-Flite claims that the Board abused its discretion when making this unit determination by giving controlling weight to the extent of unionization by the intervenor union, an emphasis specifically forbidden by 29 U.S.C. § 159(c)(5), which states that the extent to which the employees have organized shall not be controlling in determining whether a unit is appropriate under 29 U.S.C. § 159(b).
 
 
 24
 However, we find little to indicate that the Board took into account the extent of the unionization, let alone gave this factor controlling significance. See Beck Corp. v. NLRB, 590 F.2d 290, 293 (9th Cir. 1978) (per curiam) (Board can consider extent to which employees have organized). The Acting Regional Director's opinion makes no mention of the extent of the unionization, and in our review of his opinion and of the record, we have found nothing to substantiate Marriott In-Flite's charge. In fact, the only basis for this claim is the employer's contention that a consideration of all the factors involved does not support the Board's unit determination; we have already rejected this argument.
 
 
 25
 Nor do we believe that our decision in NLRB v. Purity Food Stores, Inc., 354 F.2d 926 (1st Cir. 1965), is to the contrary. As we recently noted in Big Y Foods, Inc. v. NLRB, 651 F.2d 40 (1981), Purity Food Stores merely indicated that "some minimum consideration (should) be given to the employer's side of the picture, the feasibility, and disruptive effects of piecemeal unionization." Id. at 14 (quoting NLRB v. Purity Food Stores, Inc., 354 F.2d 926, 931 (1st Cir. 1965)) (emphasis added by Big Y Foods court).[14] Particularly in view of the declaration in § 9(b) that the Board shall determine the unit appropriate to assure employees the fullest freedom in exercising the right guaranteed by the Act, the Board is entitled to give greater weight to the employees' than to the Board's view of the appropriate boundaries of the unit." Id.; see NLRB v. Living and Learning Centers, Inc., 652 F.2d 209, 213 (1st Cir. 1981). Assuming that the Board did in fact consider the extent of unionization in this case, that consideration was not unwarranted.
 
 
 26
 The petition of Marriott In-Flite Services is denied.
 
 
 27
 The petition of the NLRB for enforcement of its order is granted.
 
 
 
 [1]
 Marriott In-Flite also services an area hospital
 
 
 [2]
 In his Decision and Direction of Election, the Acting Regional Director noted that the East Boston facility has two locations: the production facility at One Wood Island Park and a storage and garage facility about 2.4 miles away from One Wood Island Park at Jeffries Street, where major vehicle repairs are made. All employees are permanently assigned to One Wood Island Park
 
 
 [3]
 Seven ballots were challenged; this number was insufficient to affect the outcome of the election
 
 
 [4]
 Section 8(a)(1) provides:
 (a) It shall be an unfair labor practice for an employer
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title(.)
 29 U.S.C. § 158(a)(1).
 
 
 [5]
 Under § 8(a)(5) it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5)
 
 
 [6]
 Although Congress effectively overruled the Supreme Court's holding in Packard Motor Car Co. v. NLRB, 330 U.S. 685, 67 S.Ct. 789, 91 L.Ed. 1040 (1947), that foremen could organize into a unit for purposes of collective bargaining, Packard is still cited for the proposition that the Board's selection of an appropriate bargaining unit is rarely to be disturbed. See, for example, South Prairie Constr. Co. v. Local No. 627, International Union of Operating Engr's, 425 U.S. 800, 805, 96 S.Ct. 1842, 1844, 48 L.Ed.2d 382 (1976) (per curiam)
 
 
 [7]
 William Thompson, the operations manager at the East Boston facility, testified that handlers or supervisors pack some very simple snacks into the carriers themselves
 
 
 [8]
 Thompson testified that the employees responsible for the paperwork and inventory in the liquor service are carried as handlers because of the degree of their responsibility, although they do not drive or even travel to the airfield
 
 
 [9]
 Thompson estimated that a team would service as few as one or as many as four flights per trip and that on average each team would make two to four trips a day to the field
 
 
 [10]
 Thompson testified to the following starting pay rates for Marriott In-Flite employees:
 Station attendant, hot or cold food $3.70/hr.
Porter 3.70/hr.
Utility/sanitation employee 3.70/hr.
Dispatcher 4.00/hr.
 Lead porter or utility/sanitation
 employee 4.00/hr.
Helper 4.25/hr.
Handler 4.85/hr.
Coordinator 5.20/hr.
Auto mechanic 6.05/hr.
In-house mechanic 6.05/hr.
Cook 4.70/hr.
Chef 6.50/hr.
 
 
 [11]
 Thompson noted that, because it acquired a new account and because another account expanded its operation, Marriott In-Flite had hired a substantially greater number of helpers recently than it would have hired under normal circumstances
 
 
 [12]
 Marriott In-Flite cites both Koester and Kalamazoo Paper Box Co., 136 N.L.R.B. 134 (1962), as "guiding principles" for determining the unit placement of truckdrivers. Although the considerations listed by the Board in Kalamazoo do not vary to any great extent from those outlined in Koester, we believe that, because Kalamazoo concerned the attempted severance of truckdrivers from an existing production and maintenance unit with a history of bargaining with the employer, Koester is more apposite to this case
 
 
 [13]
 We do not view the Acting Regional Director's reliance on National Caterers of New York, Inc., 129 N.L.R.B. 699 (1960), with quite the alarm exhibited by Marriott In-Flite. National Caterers presents a factual situation very similar to the one at hand. In National Caterers the Teamsters sought to represent flight equipment handlers and their helpers employed by Caterers, a subsidiary of Hot Shoppes, Inc., in a single unit. Another union sought to represent all production employees of the same employer. The employer contended that only a unit composed of all of its own and another local subsidiary's employees was appropriate. Id. at 700
 Because National Caterers was decided before Koester, the Board was obviously not able to utilize specifically Koester's analysis in its decision. In deciding that a separate unit for handlers and helpers was appropriate, however, the Board discussed the duties of the handlers and helpers, noting that they spent approximately one hour per work day driving, four hours loading and unloading trucks, and three hours in the employer's facilities performing such tasks as preparing ice, packing ice cream into bulk containers, and placing packaged food items on carrying trays. The Board also considered that handlers were paid a substantially higher hourly rate than all employees but the cooks, worked a longer day than food production employees, id. at 702, that all employees except handlers and helpers were interchanged, id. at 700-01, but that all employees were under common supervision. Id. at 700. The Board specifically mentioned that, although handlers and helpers did on occasion perform certain kitchen tasks, these were ordinarily performed by food production employees. Id. at 702.
 Thus it is apparent that the Board in National Caterers did in effect use the analysis outlined by Koester for determining the appropriate unit for truckdrivers. We note that the facts in the case sub judice point even more compellingly to a finding that a unit composed only of transportation department employees is appropriate.
 Marriott In-Flite requests that we take judicial notice of the Board's determinations in other Marriott Corporation cases. We see no reason to do so, because we do not believe that the Board's unit determinations for other Marriott In-Flite facilities have any particular bearing on this case. In Marriott In-Flite Services, 188 N.L.R.B. 452 (1971), the union wished to represent all eligible employees at the employer's Friendship Airport facility near Baltimore, Maryland. The Board determined that this was an appropriate unit, rejecting Marriott In-Flite's contention that its employees at its National Airport and Dulles International Airport operations, located 37 miles and 59 miles away respectively from Friendship, in Virginia, should also be included in the unit.
 Similarly in Marriott In-Flite Services, 192 N.L.R.B. 379 (1979), the unions sought to represent kitchen employees at Marriott In-Flite's facilities at John F. Kennedy Airport (two kitchens) and La Guardia Airport (one airport) in the New York metropolitan area. The employer wanted to include employees at its two kitchens at Newark Airport. In an opinion concerned with considerations of geographic and administrative coherence, the Board directed separate elections at both Kennedy and La Guardia. Id. at 380. It also included shift supervisors and kitchen clericals in the unit.
 The other Marriott In-Flite cases are equally distinguishable. See Marriott In-Flite Services, 209 N.L.R.B. 478 (1974) (enlarging unit to include not only employees at four flight-catering kitchens, but also employees at four cafeteria-type facilities in airline terminals in two New York City area airports); Marriott In-Flite Services, 168 N.L.R.B. 365 (1967) (enlarging one in-flite kitchen unit to include two similar kitchens located at same airport, when employer planned to consolidate three kitchens in near future).
 
 
 [14]
 We do not agree with Marriott In-Flite that a labor dispute involving only transportation department employees would necessarily shut down the entire East Boston facility. Moreover, if this concern were controlling, it is difficult to see how any unit other than a plant-wide unit could ever be found appropriate