**FRIENDLY ICE CREAM CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 82–1616.

United States Court of Appeals, First Circuit.

Argued Feb. 2, 1983.

Decided April 26, 1983.

Samuel Leiter, Boston, Mass., with whom Widett, Slater & Goldman, P.C., Boston, Mass., was on brief, for petitioner.

W. Christian Schumann, Washington, D.C., with whom William A. Lubbers, General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Associate General Counsel, Elliott Moore, Deputy Associate General Counsel, and Peter Winkler, Washington, D.C., were on brief, for respondent.

Before ALDRICH, BOWNES and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

Petitioner, Friendly Ice Cream Corporation (Friendly), seeks review of an order of the National Labor Relations Board (the Board), N.L.R.B. No. 112 (July 16, 1982), finding that Friendly violated Sections 8(a)(5) and 8(a)(1) of the National Labor Relations Act (the Act). 29 U.S.C. §§ 158(a)(5) and 158(a)(1). This violation occurred when Friendly refused to bargain with the Hotel, Restaurant, Bartenders and Institutional Employees Union, Local 26, AFL–CIO (the Union), the certified bargaining representative of a unit of employees at a Friendly restaurant in Weymouth, Massachusetts. There are two issues: whether the employees of this one restaurant constitute an appropriate bargaining unit; and whether the election which resulted in union representation was valid.

## FACTS

Friendly, a Massachusetts corporation, owns and operates a chain of 605 restaurants in sixteen states. The eastern region of the chain is headquartered in Wilbraham, Massachusetts. Executive personnel at Wilbraham formulate standard policies applicable to all restaurants in the chain, covering such matters as: menus, pricing, food preparation, formulas, interior and exterior decor, employee uniforms, maintenance, marketing, advertising, purchasing, inventory, cash accounting, security, hours of operation and personnel.[1] The eastern region is divided into twelve divisions, each supervised by a Division Manager. Division I, covering portions of eastern and southern Massachusetts, is further subdivided into nine districts. Each district comprises from four to nine restaurants, for a total of sixty-five restaurants within Division I. A District Manager supervises the operations of the restaurants within each district, and reports to the Division Manager.

The store involved in this proceeding, the Weymouth restaurant, is part of a district comprised of eight restaurants. The restaurant employs approximately twenty-four part-time and three full-time employees. The supervisory hierarchy of the Weymouth restaurant begins with the Shift Supervisor, who acts as the Store Manager's delegate when she or he is not present. The Store Manager, who works between fifty and fifty-five hours per week, bears overall responsibility for the day-to-day operation of the restaurant. The Store Manager is supervised by the District Manager, who regularly visits the eight restaurants within the district. While at a restaurant, the District Manager checks the supplies, sales, service, cleanliness and employees. Estimates of the frequency of the District Manager's visits range from one to three times

per week, and estimates of the length of the visits range from fifteen minutes to several hours. The District Manager reports to the Division Manager, located in Braintree, Massachusetts, who visits the Weymouth restaurant about once a month.

On April 5, 1979, the Union filed a representation petition seeking certification as the collective bargaining representative of specified employees at the Weymouth restaurant.[2] Friendly did not dispute the composition of this unit, but argued that the scope of the unit was inappropriate because it covered only a single restaurant within the chain. Friendly argued that the most appropriate unit would be one encompassing all of its restaurants in the United States. Four alternative units were also proposed: a unit composed of all restaurants within the Boston Standard Metropolitan Statistical Area; all restaurants within Division I; all restaurants within a county; or a cluster of restaurants within a defined geographical area.

The Board's Regional Office held a comprehensive fourteen-day representation hearing at which both parties presented exhaustive testimony, exhibits and arguments concerning the appropriate scope of the bargaining unit. On May 30, 1980, the Regional Director determined that the petitioned-for single store unit was appropriate and directed that an election be held. Friendly's request for review of this decision was denied by the Board on the ground that it raised no substantial issues warranting review.

An election was held on June 27, 1980, but the results proved inconclusive. Of the twenty-seven votes cast, the Union received nine and eight were cast against the Union. Of the remaining nine ballots, five were challenged by the Union, two were chal-

1. The high degree of centralized administrative control was explained by Friendly's Executive Vice-President, John Cauley, as follows: "all of the events that take place at the ... restaurant level that the customer is aware of, is [sic] uniform throughout the chain and that is by design."

2. The unit consisted of:

All full time and regular part time waiters, waitresses, cooks, busboys, busgirls, cashiers and shift supervisors employed by the Employer at its 435 Washington Street, Weymouth, Massachusetts location but excluding all bookkeepers, managers, manager trainees, assistant managers, guards and all supervisors as defined in the Act.

lenged by the employer, and two were challenged by the Board. The Regional Director conducted an investigation of the ballot challenges and of twenty-three election objections filed by the Union. Following two administrative hearings, the Acting Regional Director issued a supplemental decision sustaining the Board's challenge to one of the ballots, the Union's challenges to three of the ballots, and six of the Union's objections. A final tally of the ballots, including five additionally validated ballots, resulted in an eleven to ten victory for the Union. On September 30, 1981, the Union was certified as the exclusive bargaining representative of the employees at the Weymouth restaurant.

■ In October 1981, the Union requested collective bargaining, was refused, and filed an unfair labor practice charge. The Regional Director issued a complaint alleging that Friendly had refused to bargain with the Union in violation of Sections 8(a)(5) and 8(a)(1) of the Act. While Friendly acknowledged its refusal to bargain, it raised as an affirmative defense the invalidity of the Board's certification of the Union.[3] The Board's General Counsel moved for summary judgment, alleging that all of the issues raised by Friendly in the unfair labor practice proceeding were or could have been litigated in the representation proceeding and thus the employer was not entitled to further proceedings before the Board. *Pittsburgh Plate Glass Co. v. NLRB,* 313 U.S. 146, 162, 61 S.Ct. 908, 917, 85 L.Ed. 1251 (1941). The Board granted this motion and issued an order requiring Friendly to cease and desist from interfering with its employees' collective bargaining rights. The company was ordered to bargain collectively with the Union and to post copies of an appropriate remedial notice. Friendly now petitions for review of the Board's order, alleging that it is invalid for the following reasons:

(1) the Weymouth store is an inappropriate unit for bargaining;

(2) the Board improperly sustained the challenges to the ballots of four employees; and

(3) the Board improperly sustained six objections to Friendly's conduct during the election.

The Board cross-petitions for enforcement of its order.

## UNIT DETERMINATION

### Standard of Review

■ Primary responsibility for determining the appropriateness of a collective bargaining unit has been vested in the Board. Because this is an area requiring expertise, the Board is given extraordinarily broad discretionary power, subject only to the statutory direction that the chosen unit "assure to employees the fullest freedom in exercising the rights guaranteed by [the Act]." 29 U.S.C. § 159(b); *see also Big Y Foods, Inc. v. NLRB,* 651 F.2d 40, 45 (1st Cir.1981).

■ The Board is not required to select the most appropriate unit in a particular factual setting; it need only select *an* appropriate unit from the range of units appropriate under the circumstances. *NLRB v. J.C. Penney Co., Inc.,* 620 F.2d 718, 719 (9th Cir.1980); *NLRB v. Chicago Health & Tennis Clubs, Inc.,* 567 F.2d 331, 334 (7th Cir.1977), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978); *NLRB v. St. Francis College,* 562 F.2d 246, 249 (3d Cir. 1977); *Szabo Food Services, Inc. v. NLRB,* 550 F.2d 705, 707 (2d Cir.1976). An employer seeking to challenge the Board's unit determination cannot merely point to a more appropriate unit. Rather, the burden of proof is on the employer to show that the Board's unit is clearly inappropriate. *NLRB v. Living and Learning Centers, Inc.,* 652 F.2d 209, 213 (1st Cir.1981); *Banco Credito y Ahorro Ponceno v. NLRB,* 390 F.2d 110, 112 (1st Cir.) (per curiam), *cert. denied,* 393 U.S. 832, 89 S.Ct. 101, 21 L.Ed.2d 102

---

**3.** Under present law, an employer cannot obtain direct review of the Board's unit determination. Instead, it must refuse to bargain and then raise the issue of the unit's appropriateness in the subsequent unfair labor practice proceedings. *Pacific Southwest Airlines v. NLRB,* 587 F.2d 1032, 1035 n. 3 (9th Cir.1978).

(1968). It follows that the Board's unit determinations are rarely disturbed.

Under Section 10(e) of the Act, we, as the reviewing court, are given the power to "enter a decree enforcing, modifying, ... or setting aside in whole or in part" any order of the Board. 29 U.S.C. § 160(e). Our role is not " 'to stand aside and rubber stamp' Board determinations that run contrary to the language or tenor of the Act." *NLRB v. Weingarten, Inc.*, 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975) (quoting *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)). Rather, we must assure that the Board's unit determinations are not unreasonable, made arbitrarily or capriciously, or unsupported by substantial evidence. *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947); *Pacific Southwest Airlines v. NLRB*, 587 F.2d 1032, 1037 (9th Cir.1978); *NLRB v. Chicago Health & Tennis Clubs, Inc.*, 567 F.2d at 335; *Ochsner Clinic v. NLRB*, 474 F.2d 206, 209 (5th Cir.1973). This judicial review, however, is afforded "not for the purpose of weighing the evidence upon which the Board acted and perhaps to overrule the exercise of its discretion but to 'guarantee against arbitrary action by the Board.' " *May Department Stores Co. v. NLRB*, 326 U.S. 376, 380, 66 S.Ct. 203, 206, 90 L.Ed. 145 (1945) (quoting S.Rep. No. 573, 74th Cong., 1st Sess. 14 (1935)) (footnote omitted). While we must assure that the Board fairly and reasonably considered all relevant factors, "the weight assigned by the agency to each factor it has fairly considered is a matter for it to determine. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–465, 95 L.Ed. 456 (1951); *Vermont Yankee Nuclear Power v. N.R.D.C.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978); *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227–228, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980)." *Big Y Foods, Inc. v. NLRB*, 651 F.2d at 48. In recognition of the Board's expertise in matters of unit determinations and of the broad measure of discretion entrusted to the Board by Congress, we may at times affirm the Board's action, although we might not have reached the same unit determination. *Marriott In-Flite Services v. NLRB*, 652 F.2d 202, 207–08 (1st Cir.1981). As the Supreme Court has explained, "the decision of the Board, if not final, is rarely to be disturbed." *Packard Motor Car Co. v. NLRB*, 330 U.S. at 491, 67 S.Ct. at 793.

In making a unit determination, the Board's primary duty is to effect the Act's overriding policy of assuring employees the fullest freedom in exercising their right to bargain collectively. At the same time, the Board must "respect the interest of an integrated multi-unit employer in maintaining enterprise-wide labor relations." *NLRB v. Solis Theatre Corp.*, 403 F.2d 381, 382 (2d Cir.1968). Accordingly, the Board must grant some minimum consideration to the employer's interest in avoiding the disruptive effects of piecemeal unionization. *NLRB v. Purity Food Stores, Inc.*, 354 F.2d 926, 931 (1st Cir.1965). An employer with a central labor policy can be expected to prefer a bargaining unit which corresponds to the company's internal organization. While an employer's interest in bargaining with the most convenient possible unit should be accommodated when feasible, the Board is free to grant greater weight to the employees' interest in being represented by a representative of their own choosing. *NLRB v. Living and Learning Centers, Inc.*, 652 F.2d at 213; *Pacific Southwest Airlines v. NLRB*, 587 F.2d at 1043; *NLRB v. Western and Southern Life Insurance Co.*, 391 F.2d 119, 123 (3d Cir.), cert. denied, 393 U.S. 978, 89 S.Ct. 445, 21 L.Ed.2d 439 (1968). The Act expressly dictates that employee freedom of choice must be paramount in any unit determination. Thus, this factor of employee freedom can legitimately tip the balance in determining which of two equally appropriate units should be preferred.

The critical consideration in determining the appropriateness of a proposed unit is whether the employees comprising the unit share a "community of interest." In determining whether the requisite com-

munity of interest exists, the Board considers several criteria, no single factor alone being determinative. The factors include:

(a) geographic proximity of the stores in relation to each other;

(b) level of employee interchange between various stores;

(c) degree of autonomy exercised by the local store manager, especially with respect to labor relations;

(d) extent of union organization;

(e) history of collective bargaining;

(f) desires of the affected employees;

(g) employer's organizational framework;

(h) similarity in skills, employee benefits, wages and hours of work.

*Sohio Petroleum Co. v. NLRB,* 625 F.2d 223, 225 (9th Cir.1980); *NLRB v. J.C. Penney Co., Inc.,* 620 F.2d at 719; *NLRB v. Chicago Health & Tennis Clubs, Inc.,* 567 F.2d at 335; *NLRB v. St. Francis College,* 562 F.2d at 249.

 In weighing these factors and determining what group of employees constitutes an appropriate unit, the Board is not bound to follow any rigid rule laid down by the law or prior decisions. *Packard Motor Car Co. v. NLRB,* 330 U.S. at 491, 67 S.Ct. at 763; *Pacific Southwest Airlines v. NLRB,* 587 F.2d at 1038. Since each unit determination is dependent upon factual variations, the Board is free to decide each case on an ad hoc basis. *NLRB v. J.C. Penney Co., Inc.,* 620 F.2d at 719. The Board has, however, developed certain administrative policies which guide it in making unit determinations. When considering the appropriateness of a single store bargaining unit in a multistore retail operation, the Board is aided by its policy that a single store is "presumptively an appropriate unit for bargaining."[4] *Haag Drug Co., Inc.,* 169 N.L.R.B. 877, 878 (1968). This rebuttable presumption is consistent with the Act, has a rational foundation, and reflects the Board's expertise. Thus, in an appropriate case, the Board is entitled to invoke this presumption. *NLRB v. Baptist Hospital, Inc.,* 442 U.S. 773, 787, 99 S.Ct. 2598, 2606, 61 L.Ed.2d 251 (1979); *NLRB v. Living and Learning Centers, Inc.,* 652 F.2d at 214; *Big Y Foods, Inc. v. NLRB,* 651 F.2d at 46.

We have recently upheld the Board determination that a single store constitutes an appropriate unit for collective bargaining. In *NLRB v. Living and Learning Centers, Inc.,* 652 F.2d 209 (1st Cir.1981), the Board had ordered a representation election to be held at one day care center which was part of a twenty-nine unit chain operating in Massachusetts. While each center had a director who could hire, fire, schedule vacations and resolve work-related disputes, the director was bound by central management's specification of curriculum, wages and benefits. In reviewing the Board's unit determination, we acknowledged the high "degree of the Employer's control of personnel policies and the extent of integration of the Massachusetts centers." *Id.* at 212. Yet, we felt that these factors were insufficient to overcome the presumptive appropriateness of the single center unit. As we explained: "It [one center] immediately

**4.** The Board's unit determinations in the area of multistore retail operations have fluctuated widely. Throughout the 1950's the Board insisted that a collective bargaining unit "should embrace all employees within the categories sought who perform their work within the Employer's administrative division or [geographic] area." *Safeway Stores, Inc.,* 96 N.L.R.B. 998, 1000 (1951) (footnote omitted). In light of its increasing experience, the Board in 1962 rejected this view, replacing it with a policy which found single store units to be "presumptively appropriate unless it be established that the single plant has been effectively merged into a more comprehensive unit so as to have lost its individual identity." *Frisch's Big Boy Ill-Mar,* *Inc.,* 147 N.L.R.B. 551, n. 1 (1964) (citations omitted), *enforcement denied,* 356 F.2d 895 (7th Cir.1966). *See Haag Drug Co., Inc.,* 169 N.L.R.B. 877 (1968); *Agawam Food Mart, Inc.,* 162 N.L.R.B. 1420 (1967). While several Board decisions have found a single store unit to be inappropriate under the circumstances, *see, e.g., Kirlin's Inc.,* 227 N.L.R.B. 1220 (1977); *Gray Drug Stores, Inc.,* 197 N.L.R.B. 924 (1972); *Twenty-First Century Restaurant Corp.,* 192 N.L.R.B. 881 (1971); *Waiakamilo Corp.,* 192 N.L.R.B. 878 (1971), the Board still adheres to its presumption of appropriateness. *See, e.g., Walgreen Co.,* 198 N.L.R.B. 1138 (1972).

seems to be *an* appropriate unit because there is apt to be a bond of interest among all the persons employed by the same employer in connection with the same enterprise at the same locus." *Id.* at 213 (emphasis in original).

Similarly, in *Banco Credito y Ahorro Ponceno v. NLRB,* 390 F.2d 110 (1st Cir.) (per curiam), *cert. denied,* 393 U.S. 832, 89 S.Ct. 101, 21 L.Ed.2d 102 (1968), we affirmed the Board's determination that one branch of a twenty-nine branch bank system constituted an appropriate unit for collective bargaining. The bank's central management determined labor relations policy and established uniform salaries, working hours and fringe benefits. The branch manager, however, supervised employees on a day-to-day basis, and recommended pay increases, transfers and disciplinary measures. In upholding the Board's order, we placed special significance on the "real albeit limited authority of the branch manager as to matters of immediate importance to employees." *Id.* at 112.

Friendly would have us rely on two early First Circuit cases in which we refused to enforce the Board's determination that a single grocery store within a seven-store chain constituted an appropriate collective bargaining unit. *NLRB v. Purity Food Stores, Inc.,* 354 F.2d 926 (1st Cir.1965); *NLRB v. Purity Food Stores, Inc.,* 376 F.2d 497 (1st Cir.), *cert. denied,* 389 U.S. 959, 88 S.Ct. 337, 19 L.Ed.2d 368 (1967) (hereinafter cited as *Purity II*). These cases, however, do not stand for the proposition that central policy making in a chain operation precludes a single store unit determination. As we acknowledged in *Purity II,* "[u]nder some circumstances a single store in a retail chain may constitute an appropriate bargaining unit." *Purity II* at 501. Further, each unit determination is made on an ad

hoc basis, reflecting the peculiar intricacies of the factual situation presented by the proposed bargaining unit.[5]

Friendly alleges three major flaws in the Board's determination that the employees of the Weymouth restaurant constituted an appropriate bargaining unit. First, Friendly alleges that there was not substantial evidence to support the Board's finding that the Store Manager of the Weymouth restaurant possessed autonomy in employee relations matters. This argument is coupled with Friendly's contention that the Board committed an error of law in not affording consideration to the role of the District Manager. Second, Friendly alleges that the Board committed an error of law in not considering the degree of employee interchange among ninety-nine Friendly restaurants specified by the company. Third, Friendly finds another error of law in the Board's refusal to consider evidence showing the geographic proximity of Friendly restaurants within a circle, centered at the Weymouth store, with a radius of twenty miles. We address the three alleged errors in order.

### Autonomy of the Store Manager

The administration of the Friendly chain is a casebook study in centralized control. Like most retail chains, Friendly relies upon uniform policies which regulate practically every aspect of the individual stores' operations. But the company's determination of the most efficient form of organization cannot be ascribed controlling significance in matters of unit determination. Otherwise, "an employer, by centralizing all matters of labor policy, [could] prevent the NLRB from selecting as appropriate a unit of smaller dimensions than the employer's whole enterprise even though that smaller unit was the one which in light

---

**5.** Our refusal to enforce the Board's order in *Purity II* can be explained by our explicit reliance on *Weis Markets, Inc.,* 142 N.L.R.B. 708 (1962), a decision which held that "*the* appropriate bargaining unit in retail chain operations should embrace the employees of all stores within an employer's administrative or geographical area." *Weis Markets, Inc.,* 142 N.L.

R.B. at 710 (footnote omitted), *quoted in Purity II* at 501 (emphasis added in *Purity II*). Since 1967, when *Purity II,* was decided, the Board has reversed this position, and we have approved the Board's current policy of finding a single store unit presumptively appropriate. *See supra* pp. 576–577 and note 4.

of all the relevant factors the NLRB determined would be appropriate under [the Act]." *NLRB v. Living and Learning Centers, Inc.,* 652 F.2d at 215.

In the context of a retail chain operation, one of the most weighty factors in determining the appropriateness of a single store unit is the degree of control vested in the local store manager. Such control does not specifically refer to the local manager's freedom to establish prices, decor or menus—though control of these decisions might be indicative of the level of integration of the employer's business. Rather, the Board considers as significant the local manager's effective control of those areas "which most directly affect the restaurant's employees." *Magic Pan, Inc. v. NLRB,* 627 F.2d 105, 108 (7th Cir.1980) (per curiam). Here, the Board reasonably found that the Weymouth Store Manager exercised significant, albeit limited, authority in those matters which most directly affect the Weymouth employees.

Our independent review of the record convinces us that the Board had ample grounds for concluding that the Store Manager was, in fact, autonomous. The evidence can be summarized as follows. Employees at the Weymouth restaurant perform their day-to-day work under the immediate supervision of the Store Manager. The Store Manager is usually the only company official who interviews prospective applicants for employment. On his own, the Store Manager can decide not to grant a second interview. Job applicants receive a conditional offer of employment from the Store Manager and, in some cases, an immediate offer following the first interview.

Once hired, employees receive most of their training from the Store Manager or his designee. He regularly reviews their work and fills out quarterly written evaluations which are used as the basis for recommending wage increases. According to company policy, the District Manager must approve all wage increases, but, in practice, the Store Manager, at times, grants wage increases on the spot.

The Store Manager schedules employees' hours and tasks, within guidelines established by the company. On his own initiative he can allow an employee to leave early or take a day off. Also, on a day-to-day basis he can decide to call in more or less than the scheduled number of employees to meet changing business needs. In matters of employee discipline, the Store Manager has the authority to issue oral warnings and suspend employees. The Store Manager can recommend that written warnings be given or that an employee be terminated. And, in cases of gross misconduct, the Store Manager can discharge an employee without prior approval. The Store Manager plays a central role in the resolution of grievances, since the company's Open Door policy calls for every effort to be made to settle problems on the local level.

The facts amply support the Board's determination that the Weymouth Store Manager is effectively endowed with a significant degree of autonomy in daily labor relations. Further, the Board could reasonably find that the District Manager's oversight function, which is adequately explained in the Board's Decision and Order of Election, does not negate the Store Manager's day-to-day supervisory role.

### Employee Interchange

■ At the representation hearing which preceded the election, the hearing examiner accepted extensive testimony as to the number and type of employee transfers within the Friendly chain. In its Direction of Election of May 30, 1980, the Board recited the transfer statistics for the Weymouth restaurant during 1978: thirty-four temporary transfers (many of which lasted only for one six-hour shift) and three permanent transfers. Not mentioned by the Board was evidence, introduced by Friendly, that during the same one-year period, there had been 1,329 transfers involving ninety-nine restaurants identified by the employer.[6] Friendly alleges that

---

**6.** This 99 restaurant grouping, which was put forward by the employer, consists of Friendly's

Division I and parts of other Divisions. This

this failure to mention explicitly the interchange data for the ninety-nine restaurant grouping was an error of law. We disagree.

In support of its allegation of error, Friendly points to our decision in *Purity II* where we considered evidence of employee interchange among all of the seven grocery stores in the chain. Our reliance on this chain-wide transfer data is easily explained. At the time *Purity II* was decided we were guided by the Board's presumption that an appropriate unit should encompass an employer's administrative or geographic area. Thus, we looked at evidence pertaining to this larger area. In light of the Board's current presumption, evidence pertaining to an area larger than the proposed single store unit now has decidedly less relevance.

The Board, in its final decision, was not required to allude to every piece of evidence which the parties had chosen to present. Rather, the Board had only to consider that evidence in the record which was relevant to the issue before it; *i.e.,* assessing the appropriateness of the Weymouth bargaining unit. Evidence of interchange between the Weymouth restaurant and other restaurants within the chain was germane to this determination, and was considered by the Board. Evidence as to employee interchanges not involving the Weymouth restaurant, however, did not bear directly on the issue of the appropriateness of the Weymouth unit. Such evidence went to the question of whether a ninety-nine restaurant unit was a more appropriate collective bargaining unit—an issue which the Board was not required to address.

We also note that the interchange data relied on by Friendly does not advance its argument. Evidence pertaining only to the Weymouth restaurant indicated that it experienced approximately three transfers per month (thirty-seven transfers in one year divided by twelve months). Looking to the ninety-nine restaurant grouping, the average restaurant in this group had only one transfer per month (1,329 transfers divided

by ninety-nine restaurants divided by twelve months). If the Board felt that three transfers per month did not destroy the community of interest at the Weymouth restaurant, it would be redundant for the Board to make another finding that one transfer per store per month also did not destroy this community of interest. Thus, even were the Board under a duty to make a factual finding with respect to employee interchange among the ninety-nine restaurants, failure to do so could have had no effect on the Board's ultimate determination in this case.

We find no error in the Board's failure to mention explicitly the interchange data pertaining to the ninety-nine restaurant grouping.

*Geographic Proximity*

█ Friendly's final challenge to the appropriateness of the Weymouth unit is similar to the preceding challenge. The company alleges that the Board failed to consider the entirety of the evidence relating to the geographic proximity of the Friendly restaurants. The Board explicitly found that thirty-eight Friendly restaurants were located within a circle with a radius of fifteen miles, centered at the Weymouth restaurant ("a fifteen-mile circle"). No mention was made, however, of Friendly's evidence that fifty-eight restaurants were located in a twenty-mile circle. Again, we find no error in the Board's failure to recite this evidence.

Looking at the evidence pertaining to the number of Friendly restaurants within a fifteen-mile circle, the Board could reasonably determine that the geographic proximity of these restaurants did not destroy the community of interest which existed among the Weymouth employees. The Board was not required to look further and analyze the number of restaurants contained within a twenty-mile circle. Friendly has indicated no reason why evidence pertaining to a fifteen-mile circle is insufficient as a matter

particular grouping has not been proposed as an alternate unit for collective bargaining by

either party and has no further significance to these proceedings.

580

of law, whereas evidence pertaining to a twenty-mile circle would suffice. Without specifying the smallest geographic area which the Board must consider in making its assessment of geographic proximity, we find that the Board committed no error of law in failing to consider that area beyond a fifteen-mile circle.

We must again note that Friendly is perversely challenging the Board's failure to consider evidence which only damages its position. Evidence pertaining to the fifteen-mile circle indicates that within this area one Friendly restaurant is found for every 18.6 square miles.[7] Within the twenty-mile circle, however, one Friendly restaurant serves an area of 21.6 square miles. Expressed another way, the restaurants in the fifteen-mile circle are sixteen percent more densely packed than in the twenty-mile circle. If the Board felt that the more dense concentration of restaurants within the fifteen-mile circle did not destroy the community of interest at Weymouth, it was not required to make the redundant finding that the lesser concentration in the twenty-mile circle also did not destroy this community interest.

█ In sum, the Board's determination that the employees at the Weymouth restaurant constituted an appropriate bargaining unit was within its discretion and supported by substantial evidence in the record.

## THE ELECTION

█ We now consider the propriety of the Board's action in sustaining challenges to the ballots of four employees. When resolving ballot challenges in a representation election, the Board is vested with wide discretion. *NLRB v. A.J. Tower Co.,* 329 U.S. 324, 330, 67 S.Ct. 324, 327, 91 L.Ed. 322 (1946). Our review is restricted to an analysis of whether the Board abused its discretion. *NLRB v. Boston Beef Co., Inc.,* 652 F.2d 223, 226 (1st Cir.1981); *NLRB v. New*

*England Lithographic Co., Inc.,* 589 F.2d 29, 31 (1st Cir.1978); *NLRB v. S. Prawer & Co.,* 584 F.2d 1099, 1101 (1st Cir.1978). After reviewing the transcript of the unfair labor practice hearing and the Hearing Officer's detailed report, we find that the Board acted reasonably in sustaining the challenges to all four of the ballots.

### Cynthia Robar

Robar attempted to vote during the union election but her ballot was challenged by the Board agent on the ground that her name did not appear on his eligibility list. Friendly had inadvertently omitted Robar's name from its original list. When it discovered the error, Friendly submitted a revised list to the Regional Office. An official copy of this revised list, however, had not reached the Board agent by the time of the election. When the ballot challenges were being considered at the unfair labor practice hearing, the Union raised an additional, independent ground for challenging Robar's ballot. The Union alleged that Robar, who had been hired during the payroll period for determining voting eligibility, had not actually begun working during that period.

Friendly faults the Board's position sustaining the challenge to Robar's ballot on two grounds. First, it argues that the Board agent's challenge to Robar's ballot was improper. Second, it maintains that the Union's subsequent attempt to challenge Robar's ballot on an independent ground must be rejected as a prohibited post-election challenge.

█ Robar's name was admittedly absent from the eligibility list used by the Board agent. While the Regional Office had been informed by Friendly of this omission, the Board agent conducting the election had not been provided with an official copy of the revised eligibility list containing Robar's name. Under the circumstances, the Board agent acted reasonably in challenging Robar's ballot.

---

**7.** This figure is arrived at by straightforward mathematical calculations. The area of a circle is computed using the formula $(pi)r^2$, where "r" stands for the radius of the circle. Thus, a circle with a radius of 15 miles covers an area of 706.5 square miles. Thirty-eight Friendly restaurants are located in this area, leading to a figure of one restaurant for every 18.6 miles.

■ We also note that the Board agent's challenge resulted in the proper exclusion of an ineligible employee's vote. Wholly apart from the omission of her name from the original eligibility list, Robar was not entitled to vote. Friendly's own time sheets indicate that Robar, who had been hired during the eligibility period, had not actually begun to work during that period. Under well-settled First Circuit precedent, " 'an individual must be employed *and working* on the established eligibility date in order to be eligible to vote' in a union election." *NLRB v. Magnesium Casting Co., Inc.,* 668 F.2d 13, 19 (1st Cir. 1981) (quoting *NLRB v. Dalton Sheet Metal Co.,* 472 F.2d 257, 258 (5th Cir.1973)).

### Carol Dwyer and Brenda Hickey

Dwyer and Hickey were both full-time college students at the time of the election. Both had worked at the Weymouth restaurant during the summer preceding the election, and both were again employed by the Weymouth store in June of 1980, shortly after the representation election. The Union successfully challenged the ballots of these employees on the grounds that neither Dwyer nor Hickey was appropriately a member of the bargaining unit.

■ The Board has long relied on the distinction between casual or temporary employees and regular part-time employees. The latter have been excluded from bargaining units because they have not been found to share the requisite community of interest with full-time and regular part-time employees. We have approved of this distinction. *NLRB v. Boston Beef Co., Inc.,* 652 F.2d at 226; *NLRB v. New England Lithographic Co., Inc.,* 589 F.2d at 32–34. We agree with the Board's determination that full-time students who work on a regular part-time basis during the summer, but have the intention of returning to school in the fall, are not generally eligible to vote. *NLRB v. Sandy's Stores, Inc.,* 398 F.2d 268, 272 (1st Cir.1968). Regardless of any expectation of future summer employment, or temporary employment during school holidays, these two full-time students were not

appropriate members of the bargaining unit.

### Karen Keefe

■ Keefe's ballot was also challenged by the Union on the grounds that she was a casual employee. Keefe worked at the Weymouth restaurant for only seventeen weeks before requesting a leave of absence on May 14, 1980. During this seventeen-week work period, Keefe worked on sixteen separate days, for a total of eighty-two and a quarter hours.

In analyzing the Union's challenge to Keefe's ballot, the Board considered whether Keefe shared such a community of interest with the Weymouth employees so as to be included with them for bargaining purposes. *NLRB v. Boston Beef Co., Inc.,* 652 F.2d at 226. The Board applied its long-standing policy that classified as casual any employee who worked fewer than four hours per week during the calendar quarter (thirteen weeks) preceding the eligibility date. *Tuscarawas Landmark, Inc.,* 242 N.L.R.B. 1294 (1979); *Allied Stores of Ohio, Inc.,* 175 N.L.R.B. 966, 969 (1969). Evidence introduced at the unfair labor practice hearing showed that Keefe worked an average of only three hours per week during the calendar quarter preceding the eligibility date. The Board was under no compunction to deviate from its policy, especially with respect to an employee with only minimal contacts with the Weymouth restaurant.

There was no abuse of discretion in sustaining the challenges to the four ballots.

Because we have affirmed the election results, the question of whether the Board properly sustained six Union objections to Friendly's conduct during the election is moot. Nor need we decide whether we have jurisdiction over the election-conduct issue.

We enforce the Board's order. Friendly is ordered to cease and desist from interfering with its employees' collective bargaining rights, to bargain collectively with the Union, and to post copies of an appropriate remedial notice.

*The petition of Friendly Ice Cream Corporation is denied.*

*The petition of the National Labor Relations Board for enforcement of its order is granted.*