# United States Court of Appeals
## For the First Circuit

No. 01-2260

MASSACHUSETTS SOCIETY FOR THE PREVENTION OF CRUELTY TO CHILDREN,
Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent, Cross-Petitioner,

and

SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 509, AFL-CIO,
Intervenor.

PETITION FOR ENFORCEMENT OF AN ORDER OF

THE NATIONAL LABOR RELATIONS BOARD

Before

Torruella, Circuit Judge,

Campbell and Cyr, Senior Circuit Judges.

Barry S. Pollack, with whom Macon P. Magee, Kay H. Hodge, and Stoneman, Chandler & Miller LLP, were on brief, for petitioner, cross-respondent.
Fred L. Cornnell, Supervisory Attorney, with whom Siobhan M. Kelly, Attorney, Arthur R. Rosenfeld, General Counsel, John E. Higgins, Jr., Acting Deputy General Counsel, John H. Ferguson, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, were on brief, for respondent, cross-petitioner.
David R. Rome, with whom Pyle, Rome, Lichten & Ehrenberg, P.C., was on brief, for intervenor.

August 1, 2002

**TORRUELLA**, **Circuit Judge**.    Petitioner Massachusetts Society for the Prevention of Cruelty to Children ("MSPCC") seeks review of a decision of the National Labor Relations Board ("NLRB" or "Board").  In the proceedings below, the Board concluded that MSPCC committed unfair labor practices under the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. §§ 151-169, by failing to negotiate with the duly elected representative of a bargaining unit comprising the employees at a single facility of MSPCC's operations.  MSPCC contests, inter alia, the appropriateness of the unit certified by the Board for purposes of collective bargaining. Given the deference we show to the Board in such matters, however, we conclude that the unit determination must be sustained. Accordingly, we deny MSPCC's petition for review and grant the Board's cross-petition for enforcement of its order.

## I.  BACKGROUND

MSPCC is a nonprofit corporation that is engaged in providing mental health care services, child welfare services, and behavioral programs to children and families within Massachusetts. It has an office and a place of business in the Jamaica Plain section of Boston and maintains approximately thirty other facilities throughout the state.

On January 22, 2001, the intervenor, Service Employees International Union, Local 509, AFL-CIO ("Union" or "Local 509"), filed a petition pursuant to § 9(c) of the Act, 29 U.S.C. § 159(c), with the First Region of the NLRB.  The Union sought to represent all employees in MSPCC's Jamaica Plain office.  MSPCC contested

representation on the ground that the single location was an inappropriate bargaining unit. The Regional Director of the NLRB investigated and, on March 13, 2001, entered a decision approving the single-facility unit and ordering an election.

On March 23, 2001, MSPCC requested that the Board review the decision and stay the election. The Board denied the request on April 4, 2001, and an election was conducted on April 11, 2001. The tally of ballots showed that the employees at the Jamaica Plain facility voted in favor of representation by the Union by a margin of thirty-nine to ten. The Regional Director then issued a Certificate of Representation on April 23, 2001.

Despite certification of the Union as the collective-bargaining representative, MSPCC refused to bargain. The Union then filed an unfair labor practice charge alleging that MSPCC had violated §§ 8(a)(1) and 8(a)(5) of the Act, 29 U.S.C. § 158(a)(1) & (5).[1] The Regional Director issued a complaint, and MSPCC filed an answer defending its actions on the ground that the bargaining unit was inappropriate. Instead of first taking the case before an administrative law judge, the Board's General Counsel moved to transfer the proceeding directly to the Board for summary judgment. The Board granted the transfer. In opposition to the General Counsel's motion for summary judgment, MSPCC argued that the single-facility bargaining unit was inappropriate. In addition,

---

[1] Section 8(a)(1) of the Act generally bars an employer from engaging in anti-union coercion, 29 U.S.C. § 158(a)(1), while § 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees," id. § 158(a)(5).

-3-

MSPCC argued for the first time that the Union was disqualified from representing the employees at MSPCC's Jamaica Plain facility because of a conflict of interest.

The Board issued a Decision and Order granting the General Counsel's motion for summary judgment. Mass. Soc'y for the Prevention of Cruelty to Children, 334 N.L.R.B. No. 141 (2001). The Board upheld the appropriateness of the Regional Director's bargaining unit determination. Id., slip op. at 1. Furthermore, the Board found that MSPCC waived the issue of the Union's disqualifying conflict of interest. Id., slip op. at 1 n.1. Accordingly, the Board found that MSPCC had committed an unfair labor practice and ordered it to commence bargaining with the Union. Id., slip op. at 2-3. MSPCC then filed the instant petition for review.

## II.  ANALYSIS

The Board is assigned many functions in furtherance of its duty to effectuate the policies of the NLRA. Among them is its responsibility under § 9(c) of the Act to define the composition and scope of "unit[s] appropriate for the purposes of collective bargaining." 29 U.S.C. § 159(b). Appropriate bargaining units are the very building blocks of the federal system of labor relations. Congress thus expressly directed the Board to exercise its power under § 9(c) with the purpose of "assur[ing] to employees the fullest freedom in exercising the rights guaranteed by this subchapter." Id.

In this case, MSPCC makes a two-fold challenge to the Board's rulings concerning its duty to bargain with Local 509. MSPCC argues first that the Board erred in determining that the employees at a single facility of MSPCC's multi-facility operations constitute an appropriate unit for collective bargaining. Second, MSPCC argues that, in any event, Local 509 suffers from a conflict of interest that precludes it from representing MSPCC's employees. We address each of these arguments in turn.

## A. Single-facility unit determination

It is now well settled that "the selection of an appropriate bargaining unit lies largely within the discretion of the Board, whose decision, 'if not final, is rarely to be disturbed' . . . ." S. Prairie Constr. Co. v. Local 627, Int'l Union of Operating Eng'rs, 425 U.S. 800, 805 (1976) (quoting Packard Motor Co. v. NLRB, 330 U.S. 485, 491 (1947)); see also Friendly Ice Cream Corp. v. NLRB, 705 F.2d 570, 575 (1st Cir. 1983) ("[T]he Board's unit determinations are rarely disturbed."). Nonetheless, MSPCC asks us to take the unusual step of upending the Board's unit determination. We decline to do so.

In making its determination, "[t]he Board is not required to select the most appropriate unit in a particular factual setting; it need only select an appropriate unit from the range of units appropriate under the circumstances." Friendly Ice Cream, 705 F.2d at 574 (emphasis in original). Thus, an employer seeking to disturb the Board's unit determination cannot merely point to a more appropriate unit; rather, "the burden of proof is on the

employer to show that the Board's unit is <u>clearly inappropriate</u>." <u>Id.</u> (emphasis added).

We review unit determinations only to assure that they are not "unreasonable, made arbitrarily or capriciously, or unsupported by substantial evidence." <u>Id.</u>; <u>see also</u> <u>Nightingale Oil Co.</u> v. <u>NLRB</u>, 905 F.2d 528, 535 (1st Cir. 1990). In recognition of the Board's expertise in this area, we may affirm the Board's action, even though we might not have reached the same unit determination. <u>See</u> <u>Marriott In-Flite Servs.</u> v. <u>NLRB</u>, 652 F.2d 202, 207-08 (1st Cir. 1981).

The critical inquiry in determining the appropriateness of a proposed unit is whether the employees comprising the unit share a "community of interest." <u>Friendly Ice Cream</u>, 705 F.2d at 575. When considering the appropriateness of a single-facility bargaining unit in a multi-facility operation, the Board is also aided by its policy that a single facility is "presumptively an appropriate unit for bargaining." <u>Id.</u> (quoting <u>Haag Drug Co.</u>, 169 N.L.R.B. 877, 878 (1968)). Once this presumption is invoked, the employer bears the burden of demonstrating that the single facility is so effectively merged into a more comprehensive unit, or is so functionally integrated, that it lacks a separate identity. <u>See</u> <u>Retail Unif. Serv., Inc.</u>, 330 N.L.R.B. No. 44, slip op. at 2 (1999); <u>D & L Transp., Inc.</u>, 324 N.L.R.B. 160, 160 (1997). To determine whether such a strong shared interest between facilities exists to rebut the single-facility presumption, the Board considers several factors, with no single one being determinative.

These factors include: 1) geographic proximity of the facilities in relation to each other; 2) level of employee interchange between various facilities; 3) degree of autonomy exercised by the local managers, especially with respect to labor relations; 4) extent of union organization; 5) history of collective bargaining; 6) desires of the affected employees; 7) employer's organizational framework; and 8) similarity in skills, employee benefits, wages, and hours of work. See Friendly Ice Cream, 705 F.2d at 576.

Our review is "not for the purpose of weighing the evidence upon which the Board acted and perhaps to overrule the exercise of its discretion but to guarantee against arbitrary action by the Board." May Dep't Stores Co. v. NLRB, 326 U.S. 376, 380 (1945) (citations and internal quotation marks omitted). Thus, "[w]hile we must assure that the Board fairly and reasonably considered all relevant factors, the weight assigned by the agency to each factor it has fairly considered is a matter for it to determine." Friendly Ice Cream, 795 F.2d at 575 (citations and internal quotation marks omitted). We turn now to the principal factors disputed by the parties to determine if they were fairly and reasonably considered.

1. Geographic proximity. MSPCC has thirty sites throughout the state, divided into seven regions. The closest regional office to the Jamaica Plain facility is twenty miles, and the farthest is ninety-five miles. MSPCC argues that the Regional Director should have construed this factor in its favor. Alternatively, MSPCC maintains that, if the factor counts in favor

of a single-facility unit, the Board should not give it controlling weight. The Board contends that the distance between the Jamaica Plain facility and other facilities was correctly weighed in favor of a single-facility unit.

We see no indication that the Board gave controlling or undue weight to geographical factors. Moreover, the twenty- to ninety-five-mile distance between facilities fits comfortably alongside cases where the Board found geographical proximity to favor a single-facility unit. See, e.g., Armored, Inc. v. NLRB, 186 F.3d 844, 848 (7th Cir. 1999) (approving single-facility unit where distance between facilities was approximately one hour); Staten Island Univ. Hosp. v. NLRB, 24 F.3d 450, 455 (2d Cir. 1994) (same where distance between two hospitals was eight miles).

2. Employee interchange. MSPCC emphasizes that there has been interchange between employees at the Jamaica Plain facility and those from other MSPCC facilities. However, evidence of such interchange is fairly weak: MSPCC has only identified two employees from other facilities who work in the Jamaica Plain facility with any regularity. We therefore see no error in the Board's decision to tally this factor in favor of a single-facility unit. See NLRB v. Heartshare Human Servs., Inc., 108 F.3d 467, 471 (2d Cir. 1997) (approving a single-facility unit where there was "no routine interchange" of employees among facilities).

3. Autonomy of local employer's managers. The Regional Director concluded that the relative autonomy of local managers at MSPCC's individual facilities favored the certification of a

single-facility unit. Although final employment decisions such as hiring, firing, discipline, and promotion were approved by MSPCC's central office, the Regional Director found that local managers also had a significant role in these decisions. The Regional director also found that the local managers controlled most aspects of the day-to-day operation of the facility and supervision of employees.

Although MSPCC assails the Regional Director's decision to count this factor in favor of a single-facility unit, we detect no abuse of discretion. Our review of the record confirms that substantial evidence supports the Regional Director's understanding of the duties and responsibilities of local managers in MSPCC's individual facilities.

4. <u>History of collective bargaining</u>. It is undisputed that there is no prior history of collective bargaining anywhere in MSPCC's operation. However, the parties disagree over how this fact should enter into the bargaining-unit calculus. MSPCC argues that the absence of bargaining history should assist it in rebutting the single-facility presumption. The Board, on the other hand, argues that the absence of a bargaining history should weigh in favor of a single-facility unit.

It is probably most accurate to say that the dearth of prior bargaining favors neither position in any active sense. <u>See Heartshare Human Servs.</u>, 108 F.3d at 472 (stating that absence of previous bargaining made that factor "irrelevant"). Nonetheless, it was certainly within the agency's discretion to conclude that

the factor created no impediment to establishing a single-facility unit.  And, based on our reading of the Regional Director's decision, we are convinced that no abuse of discretion occurred in taking bargaining history into account.

  5.  <u>Organizational framework</u>.  The Regional Director found that MSPCC maintained a high degree of central control with respect to its operations and labor relations.  Such control is evidenced by MSPCC's decision to maintain uniform job descriptions, pay structure, and benefits throughout its facilities.  However, the Regional Director noted that integration of MSPCC's operations was limited by the fact that each facility provides essentially the same services, thus eliminating the need for clients to progress from one facility to another.

  Overall, the Regional Director construed this factor in MSPCC's favor.  Nevertheless, MSPCC complains that the factor was not given the weight it deserved and that the strong showing of an integrated organizational framework should have rebutted the single-facility presumption.  We find no error in the Regional Director's appraisal of this factor. As we noted earlier, our task is only to assure that each factor was "fairly and reasonably considered . . . [;] the weight assigned by the agency to each factor . . . is a matter for [the agency] to determine." <u>Friendly Ice Cream</u>, 795 F.2d at 575.  The Regional Director considered this factor; he simply did not find it dispositive when placed in context.

6.  Other factors.  Where an employer is engaged in the health care industry, the Board will also weigh evidence of "an increased risk of work disruption or other adverse consequences." Manor Healthcare Corp., 285 N.L.R.B. 224, 226 (1987).  MSPCC argues that the possibility that patient care could be interrupted by bargaining on a single-facility basis was not considered by the Board and that such a factor should have counted strongly in MSPCC's favor.[2]  However, we see no evidence presented to the Board that disruption would be likely to occur.  Without such evidence, we will not require the Board to take into consideration mere unsupported speculation that a single-facility unit might interfere with patient care.  See Staten Island Univ. Hosp., 24 F.3d at 457 (rejecting employer's unsubstantiated claim that wage "whipsawing" would jeopardize patient care).

---

[2]  MSPCC also argues that the Board failed to heed Congress's admonition that "[d]ue consideration should be given by the Board to preventing proliferation of bargaining units in the health care industry."  H.R. Rep. No. 93-1051, at 6 (1974), reprinted in 1974 U.S.C.C.A.N. 3946, 3950.  However, MSPCC seems to mistake the object of Congress's concern.  The reference in the House Report to the proliferation of bargaining units in the health care industry was directed at some of the Board's determinations regarding unit composition (i.e., the types of employees to be included in a bargaining unit).  See Cal. Pac. Med. Ctr. v. NLRB, 87 F.3d 304, 309 n.4 (9th Cir. 1996).  The instant dispute, by contrast, concerns the Board's determination of unit scope (i.e., the extent to which the unit will encompass separate facilities of a single employer).  Moreover, this admonition by Congress does not have the force of law.  See Am. Hosp. Ass'n v. NLRB, 499 U.S. 606, 616 (1991).  Instead, the statement is best understood as "a form of notice to the Board that if it did not give appropriate consideration to the problem of proliferation in this industry, Congress might respond with a legislative remedy."  Id. at 617. "If Congress believes that the Board has not given 'due consideration' to the issue, Congress may fashion an appropriate response."  Id.

-11-

7.   <u>Evaluation of the totality of factors</u>.   In his decision establishing the single-facility as an appropriate unit, the Regional Director summarized his evaluation of the various factors as follows:

> [A]lthough [MSPCC] has established a high degree of centralization in regards to its operations and labor relations, the duties and responsibilities of its local managers in each Region, together with the almost total lack of employee interchange and transfers, the distances of the various facilities, and the absence of a bargaining history on a multi-employer basis, prevent [MSPCC] from rebutting the single-location presumption.

Despite MSPCC's protestations to the contrary, we see no reason to disturb the unit determination.   The Board has applied its single-facility presumption to health care facilities with court approval.   <u>See</u>, <u>e.g.</u>, <u>Heartshare Human Servs.</u>, 108 F.3d at 471; <u>Cal. Pac. Med. Ctr.</u> v. <u>NLRB</u>, 87 F.3d 304, 310 (9th Cir. 1996). Moreover, all of the relevant factors were fairly and reasonably considered.   The fact that certain factors favored MSPCC's position is by no means dispositive.   Rather, "a strong showing on just a few of the factors may suffice to sustain the Board's decision, which is entitled to considerable deference on such matters." <u>Heartshare Human Servs.</u>, 108 F.3d at 472.   We therefore reject MSPCC's challenge to the Board's unit determination.

## B.   Conflict-of-interest

MSPCC also contends that it had no duty to engage in collective bargaining because Local 509 has a conflict of interest that disqualifies it from representing employees of MSPCC.   <u>See</u>

<u>CMT, Inc.</u>, 333 N.L.R.B. No. 151, slip op. at 1 (2001) ("It is well settled that a union may not represent the employees of an employer if a conflict of interest exists on the part of the union such that good-faith collective bargaining between the union and the employer could be jeopardized."). In particular, MSPCC claims that the Union's disqualifying conflict arises from its efforts, on behalf of certain public-employee members it represents, to limit the state's ability to sub-contract work to private entities such as MSPCC.

> As this court has stated:

> There is a strong public policy favoring the free choice of a bargaining agent by employees. The choice is not to be lightly frustrated. There is a considerable burden on the nonconsenting employer, in such a situation as this, to come forward with a showing that danger of a conflict of interest interfering with the collective-bargaining process is clear and present.

<u>NLRB</u> v. <u>David Buttrick Co.</u>, 399 F.2d 505, 507 (1st Cir. 1968). In order to satisfy this heavy burden, an employer must show that the alleged conflict of interest is "proximate and substantial, not remote and speculative." <u>Greyhound Lines, Inc.</u>, 319 N.L.R.B. 554, 557 (1995).

MSPCC raised the conflict-of-interest issue for the first time in the unfair labor practice proceedings following its refusal to bargain with the newly elected representative. Reasoning that the employer could have raised the issue in the prior representation proceeding, the Board concluded that the conflict argument had been forfeited. <u>MSPCC</u>, 334 N.L.R.B. No. 141, slip op.

at 1 n.1 (citing Colonial Garden Care Ctr., 268 N.L.R.B. 613,614 n.1 (1984)). We agree with the Board and find that MSPCC's failure to seasonably raise the issue precludes review in these proceedings as well.

"[C]ourts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952); see also N. Wind, Inc. v. Daley, 200 F.3d 13, 18 (1st Cir. 1999) (noting that "this rule preserves judicial economy, agency autonomy, and accuracy of result by requiring full development of issues in the administrative setting to obtain judicial review." (citations and internal quotation marks omitted)). In this vein, the Board has established a reasonable rule precluding review of issues raised for the first time in unfair labor practice cases that could have otherwise been raised in an earlier representation proceeding. See 29 C.F.R. § 102.67(d) & (f) (1998); see also Magnesium Casting Co. v. NLRB, 401 U.S. 137, 141-42 (1971); Pittsburgh Plate Glass Co. v. NLRB, 313 U.S. 146, 161-62 (1941). In the absence of newly discovered evidence or special circumstances, we will therefore enforce the Board's rule without hesitation. See Fall River Sav. Bank v. NLRB, 649 F.2d 50, 58-59 (1st Cir. 1981); S.D. Warren Co. v. NLRB, 353 F.2d 494, 497 (1st Cir. 1965).

MSPCC maintains that the Board's waiver is inapplicable because the conflict-of-interest issue did not become "ripe" as a

-14-

matter of law until the Union was actually elected by the employees and certified by the Regional Director. In support of this argument, MSPCC relies on the following dicta from a dissenting opinion from the Fourth Circuit: "Indeed, it is certification itself which creates the union's duty to avoid any conflict with its bargaining duties." NLRB v. Annapolis Emerg. Hosp. Ass'n, 561 F.2d 524, 533 (4th Cir. 1977) (en banc) (Hall, J., dissenting).[3]

MSPCC's contention flies in the face of both experience and logic. The Board has repeatedly examined conflict-of-interest challenges that were raised in the first instance during representation proceedings. See, e.g., CMT, 333 N.L.R.B. No. 151, slip op. at 2 (addressing employer's conflict-of-interest claim raised in a representation proceeding); Sierra Vista Hosp., Inc., 241 N.L.R.B. 631, 635 (1979) (requiring the employer to argue union's alleged conflict of interest at the representation phase). Moreover, at the representation phase, whether a labor organization is legally capable of representing a proposed unit of employees is more than an abstract or academic question. The Regional Director's decision on the issue will determine whether employees may vote for a particular labor organization or, indeed, whether an election may be held at all. We therefore conclude that the

---

[3] Notably, MSPCC's briefs give the misleading impression that the quoted language is drawn from the majority opinion of the en banc court, rather than the dissent. See Petitioner's Br. at 35; Petitioner's Reply Br. at 3. There is certainly no harm in citing to dissenting opinions from our sister circuits, as we are free to look to them for their persuasive value. However, we generally expect litigants before this court to accurately depict the opinions on which they rely.

Union's alleged conflict of interest was "ripe" for review at the representation phase and that MSPCC, by failing to raise the issue at that time, forfeited its right to assert the claim during the unfair labor practice proceedings.

As a fallback position, MSPCC argues that the conflict-of-interest issue should be remanded for consideration by the Board in light of new evidence, unavailable at the time of the Board proceedings, that supports its claim. Section 10(e) of the Act provides, in relevant part:

> If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board . . . , the court may order such additional evidence to be taken before the Board . . . , and to be made a part of the record.

29 U.S.C. § 160(e). Because we find MSPCC's claim of a disqualifying conflict to be entirely conjectural (even in light of its newly discovered evidence), we decline to take such action.

The evidence of a disqualifying conflict of interest presented to the Board consisted of: 1) reprints of news stories from 1991-1997 describing objections by the Union to the privatization of services then provided by state employees; and 2) legislation submitted on behalf of the Massachusetts AFL-CIO -- of which the Union is a member -- for the 2001 legislative session, that would require private contractors receiving state contracts to hire laid-off state employees whose jobs were affected by the privatization prior to the private contractor hiring or

-16-

transferring other employees to carry out the work.  Although never presented by MSPCC in the representation proceeding, both pieces of evidence were available at that time.  Even the legislation from 2001 should have come as no surprise to MSPCC; identical bills were filed by the Massachusetts AFL-CIO in 1997 and 1999.

The only truly "new" evidence MSPCC brings to the table is a recent collective-bargaining proposal made to the Commonwealth of Massachusetts by an alliance of labor organizations (including the Union) representing state employees.  The contract proposal calls for limitations on subcontracting and for the creation of a committee authorized to review and recommend decisions concerning contracting-out.  The final contract language, also presented by MSPCC as new evidence, authorizes a committee with the power to discuss and make suggestions concerning contracted services.  In our view, however, this newly discovered evidence is merely duplicative of information that was already in MSPCC's hands -- namely, that labor organizations whose membership includes state employees were concerned about the contracting-out of public services to private entities.

"As a general proposition, the 'conflict of interest' doctrine has not been applied to restrict employees from selecting a bargaining representative solely because the labor organization represents both employees of an employer and the employees of a subcontractor doing business with their employer."  CMT, 333 N.L.R.B. No. 151, slip op. at 2.  And in this case, neither the evidence presented to the Board below nor the evidence adduced for

-17-

the first time before this court persuades us that we should deviate from the Board's general rule. Indeed, viewed in its totality, MSPCC's conflict-of-interest evidence paints a fairly mundane portrait of a labor organization that represents both employees of an employer and the employees of a subcontractor. While umbrella organizations to which the Union belongs have expressed opposition to the continuing contracting-out of work performed by public employees, there is no indication -- much less a clear and present danger -- that such action jeopardizes Local 509's ability to engage in good faith bargaining with MSPCC.

To be sure, there are cases where a labor organization has actively pursued the elimination of all subcontracting and effectively sought to extinguish the bargaining unit comprising the subcontractor's employees. In such cases, the Board has rightly found that revocation of the labor organization's certification is appropriate. See, e.g., Valley W. Welding Co., 265 N.L.R.B. 1597 (1982); Catalytic Indus. Maint. Co., 209 N.L.R.B. 641 (1974). But the Union's actions in this case are a far cry from such destructive tactics. Indeed, it is entirely possible that the Union, having won the representation election, will soften or abandon its stance on contracting-out. See CMT, 333 N.L.R.B. No. 151, slip op. at 2 (noting that after certification of the union, its "interest in seeking to remove the subcontracted work may well cease to exist"). Since we detect no colorable claim of a disqualifying conflict, any remand based on the supposed new evidence would be, in our view, futile. See NLRB v. Wyman-Gordon

-18-

<u>Co.</u>, 394 U.S. 759, 766-67 n.6 (1969) (admonishing that we should not convert judicial review of agency action into "a ping-pong game" where remand would be "an idle and useless formality").

We do not suggest that MSPCC is forever banned from asserting the alleged conflict of interest. "The Board has consistently held that it may police its certifications by amendment, clarification, or even revocation." 1 <u>The Developing Labor Law</u> 447 (Patrick Hardin ed., 3d ed. 1992). If at some point MSPCC discovers credible evidence of a disqualifying conflict of interest on the part of Local 509, it is free to move the Board for revocation of the Union's certification. At this juncture, however, MSPCC must abide by the wishes expressed by a majority of employees at the Jamaica Plain facility to be represented by the Union for purposes of collective bargaining.

### III. CONCLUSION

For the reasons stated above, we **<u>deny</u>** MSPCC's petition for review and **<u>grant</u>** the Board's cross-petition for enforcement. Costs are taxed against the petitioner. <u>See</u> Fed. R. App. P. 39(a)(2).